## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

American Civil Liberties Union of Michigan,

                    Plaintiff,

     v.

Federal Bureau of Investigation, *et al*.

                    Defendants.

Case No. 2:11-cv-13154
Honorable Lawrence P. Zatkoff

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Nusrat J. Choudhury
Hina Shamsi
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 519-7876
nchoudhury@aclu.org
hshamsi@aclu.org

Stephen C. Borgsdorf
Dykema Gossett PLLC
2723 S State St., Suite 400
Ann Arbor, Michigan  48104
Phone: (734) 214-7663
sborgsdorf@dykema.com

Mark P. Fancher (P56223)
Michael J. Steinberg (P48085)
Kary L. Moss (P49759)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
Phone: (313) 578-6822
mfancher@aclumich.org

*Attorneys for Plaintiff*

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Schell v. U.S. Dep't of Health and Human Servs.*,
843 F.2d 933, 936 (6th Cir. 1988) (citing *EPA v. Mink*, 410 U.S. 73, 80 (1973))……......... 7

*U.S. Dep't of Justice v. Tax Analysts*,
492 U.S. 136, 151 (1989) ……………………………………………………………. 7

*NLRB v. Robbins Tire & Rubber Co.*,
437 U.S. 214, 242 (1978)……………………………………………………………7

*Campbell v. U.S. Dep't of Justice*,
164 F.3d 20, 27 (D.C. Cir. 1998)…………………………………………………….. 7

*Rugiero v. U.S. Dep't of Justice*,
257 F.3d 534, 547 (6th Cir. 2001)…………………………………………………..7

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1, 7 (2001)……………………………………………………………….. 7

*John Doe Agency v. John Doe Corp.*,
 493 U.S. 146, 151–52 (1989)…………………………………………………….8

*Akron Standard Div. of Eagle-Picher Indus. v. Donovan*,
780 F.2d 568, 571 (6th Cir. 1986)…………………………………………………. 8

*Am. Civil Liberties Union v. Dep't of Def.*,
543 F.3d 59, 66 (2d Cir. 2008)…………………………………………..…… 8

*Klamath Water Users Protective Ass'n*,
532 U.S. at 7–8 …………………………………………………………….… 8

*Abbotts v. Nuclear Regulatory Comm'n*,
766 F.2d 604, 606 (D.C. Cir. 1985)…………………………………………..……… 8

*Wilner v. Nat'l Sec. Agency*,
592 F.3d 60, 68 (2d Cir. 2009)………………………………...…………………… 8

*Cloonan v. Holder*,
768 F. Supp. 2d 154, 162 (D.D.C. 2011)…………………………………..……………… 9

*Sussman v. U.S. Marshals Serv.*,
808 F. Supp. 2d 192, 200 (D.D.C. 2011) …………………………………………..…… 9

*Brown v. FBI*, 793 F. Supp. 2d 368, 384–85 (D.D.C. 2011) ………………………………… 9

*Lair v. Dep't of Treasury*,
No. Civ. A. 03–827 (RCL), 2005 WL 645228, (D.D.C. Mar. 21, 2005) …………………….. 9

*Prison Legal News v. Lappin*,
436 F. Supp. 2d 17, 22 (D.D.C. 2006) ………………………………………………………… 9

*FBI v. Abramson*,
456 U.S. 615 (1982)………………………….………………………….……………………... 10

*Ferguson v. FBI*,
83 F.3d 41 (2d Cir. 1996)………………………………………………..……………………… 10

*Williams v. FBI*,
69 F.3d 1155 (D.C. Cir. 1995)…………………………………………………..……………10

*Jones v. FBI*,
41 F.3d 238 (6th Cir. 1994)……………………………………………………………….. 10

*Cunningham v. FBI*,
765 F.2d 61, 62 (6th Cir. 1985)……………………………………….………………………10

*Kiraly v. FBI*,
728 F.2d 273, 279 (6th Cir. 1984)………………………………………………………… 10

*Kiraly v. Clark*,
466 U.S. 959 (1984)……………………………………………………………………….. 10

*Peralta v. U.S. Attorney's Office*,
69 F. Supp. 2d 21, 26 (D.D.C. 1999)………………………………………………………… 10

*Davin v. U.S. Dep't of Justice*,
60 F.3d 1043, 1049 (3d Cir. 1995) …………………………………………………….......  10

*Oglesby v. U.S. Dep't of Army*,
920 F.2d 57, 68 (D.C. Cir. 1990) …………………………………………………………… 11

*Negley v. FBI*,
658 F. Supp. 2d 50, 60 (D.D.C. 2009)  ………..……………………………………….......11

*CareToLive v. FDA*,
631 F.3d 336, 340 (6th Cir. 2011) ……………………………………………………….  12

*Church of Scientology of Cal. v. IRS*,

792 F.2d 146, 151 (D.C. Cir. 1986)…………………………………………………….. 12

*Weisberg v. U.S. Dep't of Justice*,
705 F.2d 1344, 1350–52 (D.C. Cir. 1983)…………………...……………………… 12

*Nation Magazine v. U.S. Customs Serv.*,
71 F.3d 885, 890–92 (D.C. Cir. 1995) …………………………...…………………….. 12

*Raulerson v. Ashcroft*,
271 F. Supp. 2d 17, 22 (D.D.C. 2002) …………………………………………………12

*Neugent v. U.S. Dep't of the Interior*,
640 F.2d 386, 389–90 (D.C. Cir. 1981) …………………………………………………….. 12

*Am. Friends Serv. Comm. v. Dep't of Def.*,
831 F.2d 441, 445 (3d Cir. 1987)……………………………………………………… 13

*EPIC v. Dep't of Justice*,
584 F. Supp. 2d 65, 72 (D.D.C. 2008) ……………………………………………………15

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
566 F.2d 242, 261 (D.C. Cir. 1977)………..……………………………………………15

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
488 F.3d 178, 187 (3d Cir. 2007)…………………………………………….…..……… 16

*Powell v. U.S. Bureau of Prisons*,
927 F.2d 1239, 1242 (D.C. Cir. 1991)……………………………………………………16

*Manna v. U.S. Dep't of Justice*,
51 F.3d 1158, 1164 (3d Cir. 1995) …………………………………………………….. 17

*Founding Church of Scientology v. Nat'l Sec. Agency*,
610 F.2d 824 n. 49 (D.C. Cir. 1979)……………………………………………………… 19

*Campbell v. Dep't of Health and Human Servs.*,
682 F.2d 256, 259 (D.C. Cir. 1982)…………………………………………………….. 21

*North v. Walsh*,
881 F.2d 1088, 1097 (D.C. Cir. 1989) …………………..…………………………….. 21

*Manna v. U.S. Dep't of Justice*,
51 F.3d 1158, 1164 (3d Cir. 1995)………..…………………………...…………………… 21

*Dickerson v. Dep't of Justice*,
992 F.2d 1426, 1433 (6th Cir. 1993) …………………………………..…………………… 22

*Halpern v. FBI*,
181 F.3d 279, 293 (2d Cir. 1999) …………………………………………………………22

*Am. Civil Liberties Union v. U.S. Dep't of Justice*,
265 F. Supp. 2d 20, 27 (D.D.C. 2003)…………………………………………………….. 23

*Allard K. Lowenstein Int'l Human Rights Project v. U.S. Dep't of Homeland Sec.*,
626 F.3d 678, 680–82 (2d Cir. 2010) …………...……………………………………………30

*Rosenfeld v. Dep't of Justice*,
57 F.3d 803, 815 (9th Cir. 1995)………………………………………………………...30

*Boyd v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
Civil Action No.: 05-1096, 2006 WL 2844912, *9 (D.D.C. Sept. 29, 2006)……...…………..30

*Bay Area Lawyers for Nuclear Arms Control v. Dep't of State*,
818 F. Supp. 1291, 1299 (N.D. Cal. 1992) …………….…………………………………… 30

*King v. U.S. Dep't of Justice*,
830 F.2d 210, 224 (D.C. Cir. 1987)……………………………………………...…………30

*Benavides v. DEA*, 968 F.2d 1243, 1246, 1249 (D.C. Cir.),
*modified on reh'g by* 976 F.2d 751 (D.C. Cir. 1992) ………..…………………………………31

*Islamic Shura Council v. FBI*,
779 F. Supp. 2d 1114, 1126 (C.D. Cal. 2011)……..……………………………………..32

*Phillippi v. CIA*,
546 F.2d 1009 (D.C. Cir. 1976) …………………………………………………………32

*Wilner v. Nat'l Sec. Agency*,
    592 F.3d 60, 68 (2d Cir. 2009)………………………………………………… 33

*Bassiouni v. CIA*,
392 F.3d 244, 246 (7th Cir. 2004)…………………………….…………………… 33

*Minier v. CIA*,
88 F.3d 796, 800–02 (9th Cir. 1996)…………………………..………………….. 33

*Lame v. U.S. Dep't of Justice*,
654 F.2d 917, 921 (3d Cir. 1981)……………………………,,,.…………………33

*Roth v. U.S. Dep't of Justice*,
642 F.3d 1161, 1171–72 (D.C. Cir. 2011)…………………….,,..……………………33

*Moore v. CIA*,
666 F.3d 1330, 1331 (D.C. Cir. 2011) ……………………………………………………33

*Hicklin Eng'g, L.C. v. Bartell*,
39 F.3d 346, 348−49 (7th Cir. 2006)…………………..……………………………….35

*Cf. Granite Auto Leasing Corp. v. Carter Mfg. Co.*,
546 F.2d 654, 656 (5th Cir. 1977)………………………………………………………35

*Press-Enter. Co. v. Superior Ct. of Cal.*,
464 U.S. 501, 510 (1984)…………………………………………………….………35

*Nixon v. Warner Commc'ns*,
435 U.S. 589, 597 (1978)……………………………………………………………...35

*Kamakana v. City & Cnty of Honolulu*,
447 F.3d 1172, 1179 (9th Cir, 2006) …………………………………………………35

**INTRODUCTION**

This Freedom of Information Act ("FOIA") case concerns the public's right to know whether the Federal Bureau of Investigation ("FBI") is unconstitutionally and illegally profiling Michigan communities on the basis of race, ethnicity, religion, and national origin.  Plaintiff, the American Civil Liberties Union of Michigan, seeks the disclosure of documents concerning the FBI's implementation of its authority under the 2008 Domestic Investigations and Operations Guide ("DIOG") to collect and map local communities' racial and ethnic information in investigations, including those not based on any reasonable suspicion of wrongdoing.  Although the public needs this information to engage in informed debate about the civil rights and civil liberties impact of the FBI's use of its DIOG authority in Michigan, Defendants have sought to withhold almost all responsive information.  Yet, even the limited information the FBI released in response to Plaintiff's FOIA request ("Request") and nearly identical requests in other states demonstrates that the FBI is profiling communities without evidence of wrongdoing and on the basis of crude stereotypes, underscoring the need for disclosure of precisely the information Plaintiff seeks.

Plaintiff opposes Defendants' motion to dismiss the FBI as a defendant from the case and cross-moves for partial summary judgment on claims challenging Defendants' failure to adequately search for responsive documents and their improper withholding of publicly-available information concerning the racial, ethnic and religious demographics of Michigan communities.

Defendants' motion to dismiss the FBI as a defendant fails because the plain language of the FOIA permits the FBI to be sued for violating the statute.  Defendants also fail to meet their burden of demonstrating that they conducted an adequate search for two reasons.  First, they fail to present sufficiently detailed affidavits to allow Plaintiff to properly challenge, and the Court to assess, the adequacy of their search procedures; and second, the Defendants' search methods as

1

described on the face of their declaration were not reasonably calculated to locate responsive records. Nor have Defendants carried their burden to show that they have disclosed all non-exempt and reasonably segregable information describing the FBI's use, and reliance on, Michigan communities' racial and ethnic information, including publicly-available census data, contained in 145 documents withheld in full or in part. According to Defendants, that information may be withheld principally under FOIA Exemption 7A, which applies to law enforcement records, and secondarily under Exemption 1, which applies to classified information. But those exemptions cannot be used to keep from the public segregable portions of the documents showing the FBI's use of public source information, including census data and population statistics. Defendants also fail to justify their withholding of certain DIOG training materials under Exemption 7E.

Finally, Plaintiff believes that Defendants may have relied on the FOIA's exclusion provision, 5 U.S.C. § 552(c) ("Section 552(c)"), in responding to the Request, and seeks judicial review of this possible invocation. Plaintiff proposes that the Court review Defendants' possible reliance on Section 552(c) through a procedure akin to the "Glomar" procedure, which would permit meaningful judicial review and public access to judicial opinions.

Accordingly, Plaintiff respectfully requests that the Court: 1) deny Defendants' motion to dismiss the FBI from this action; 2) order Defendants to conduct a thorough search for responsive records and to submit a detailed affidavit describing that search; 3) order Defendants to disclose all segregable, non-exempt material from the documents withheld in full or in part, or in the alternative, review *in camera* unexpurgated versions of these records to determine what segregable, non-exempt material exists and order disclosure of that information; 4) order Defendants to disclose information withheld from the DIOG training materials; and 5) order

Defendants to make a public filing stating whether they interpret all, or portions of, the Request as seeking records that fall under the FOIA provision permitting exclusion of certain records, 5 U.S.C. § 552(c)(3), and if so, whether they have refused to process those portions of the Request.

## STATEMENT OF FACTS

In 2003, the Department of Justice issued its Guidance Regarding the Use of Race by Federal Law Enforcement Agencies ("Guidance on Race"), which prohibited race from being used "to any degree" in FBI investigations (unless describing a specific suspect), but carved out a loophole permitting racial and ethnic profiling in national security and border integrity investigations.[1]  In December 2008, the Department of Justice issued revised Attorney General Guidelines, which govern the FBI's conduct in criminal, national security, and counterintelligence investigations, and which authorized the FBI to conduct investigations called "assessments" without requiring a factual predicate suggesting that the target is involved in illegal activity or poses a national security threat.[2]  That same month, the FBI issued its Domestic Investigations and Operations Guide, an internal guide to implementing the Attorney General Guidelines.[3]

As part of an intelligence program called "Domain Management," the DIOG authorizes FBI agents to collect, map, and analyze racial and ethnic demographic information, and to identify "concentrated ethnic communities" and the location of "ethnic-oriented businesses" and other facilities "if the[se] locations will reasonably contribute to an awareness of threats and

---

[1] U.S. Dep't of Justice, Guidance Regarding the Use of Race by Federal Law Enforcement Agencies 2 (2003) http://www.justice.gov/crt/about/spl/documents/guidance_on_race.pdf.
[2] U.S. Dep't of Justice, The Attorney General's Guidelines for Domestic FBI Operations (2008), http://www.justice.gov/ag/readingroom/guidelines.pdf (2008 Attorney General's Guidelines).
[3] Fed. Bureau of Investigation, Domestic Investigations and Operations Guide (2008), *available at* http://www.muslimadvocates.org/cgi-bin/mt/mt-search.cgi?IncludeBlogs=1&search=investigative ("DIOG").

vulnerabilities" and assist in "intelligence analysis."  Declaration of Nusrat J. Choudhury

("Choudhury Decl.") Ex. A at 32–33 (Fed. Bureau of Investigation, Domestic Investigations and

Operations Guide § 4.3(C)(2) (Dec. 16, 2008)).  The DIOG also allows the FBI to collect and

track "[s]pecific and relevant ethnic behavior," "behavioral characteristics reasonably . . .

associated with a particular criminal or terrorist element of an ethnic community," and

"behavioral and cultural information about ethnic or racial communities that is reasonably likely

to be exploited by criminal or terrorist groups who hide within those communities in order to

engage in illicit activities undetected," including "cultural tradition[s]."  *Id.* at 33–34.

　　　The FBI's implementation of its DIOG authority to collect and use racial, ethnic, or

religious information raises grave civil rights and civil liberties concerns because it could be

based on, or lead to, the illegal and unconstitutional profiling of communities for investigation

and intelligence gathering, including suspicionless investigations.  Choudhury Decl. Ex. B

(Compl. ¶ 13).  According to census data, one in five Michigan residents could be considered

"ethnic."  *See* Choudhury Decl. Ex. C at 8 (2010 Census Redistricting Data (Public Law 94-171)

Summary File: Race, U.S. Census Bureau (2010) (Michigan Data)).

　　　In 2009, the FBI's then General Counsel, Valerie Caproni, acknowledged to Congress

that the DIOG raises civil liberties issues.  S. Rep. No. 111-6, at 34 (2009) ("[W]e understand

that the expansion of techniques available . . . has raised privacy and civil liberties

concerns . . . .").  Ms. Caproni told the Senate Select Committee on Intelligence that the FBI

would reassess its racial and ethnic mapping authority after a year based on its implementation

and "comments and suggestions" from Congress and others.  *Id.*  Yet, until Plaintiff commenced

this action, there have been virtually no publicly available facts about the FBI's implementation

4

in Michigan of its DIOG authority.  Without that information, the public is unable to provide the

comments invited by the FBI, or to engage in informed debate.[4]

   Plaintiff served the FBI with a FOIA request on July 27, 2010.  Decl. of Mark Fancher

¶ 3, Ex. A ("Fancher Decl."); Decl. of David M. Hardy, ECF No. 19-1 ("Hardy Decl.") Ex. A.[5]

The Request seeks records concerning the FBI's collection, mapping, and use of Michigan

communities' racial or ethnic information, and the maps themselves.  *Id.* at 2–4.

   On August 6, 2010, David Hardy, the Section Chief of the Record/Information

Dissemination Section of the FBI Records Management Division, acknowledged receipt of the

Request.  Fancher Decl. ¶ 6, Ex. C; Hardy Decl. ¶ 6.  On December 22, 2010, the FBI released

298 pages of DIOG training materials and withheld information from 48 of these pages under

FOIA Exemptions.  Fancher Decl. ¶¶ 8–9, Ex. E; Hardy Decl. ¶ 8.  Plaintiff timely appealed the

withholdings on February 16, 2011.  Fancher Decl. ¶ 10, Ex. F; Hardy Decl. ¶ 9.

---

[4] "Mapping" programs by local law enforcement agencies have been terminated due to civil
rights and civil liberties concerns.  A Los Angeles Police Department plan to map Muslim
communities by race and religion was abandoned due to public outcry.  *See* Richard Winton &
Teresa Watanabe, *LAPD's Muslim Mapping Plan Killed*, L.A. Times, Nov. 15, 2007,
http://articles.latimes.com/2007/nov/15/local/me-muslim15.  Recent revelations make clear,
however, that other cities have implemented such mapping programs.  The NYPD engaged in
discriminatory religious and national origin profiling when it mapped and created dossiers on
Muslims' places of work and worship without any suspicion of criminal activity.  Adam
Goldman & Matt Apuzzo, *NYPD Built Secret Files on Mosques Outside NY*, Associated Press,
Feb. 22, 2012, http://bit.ly/HgeBPt.
[5] Affiliates of the American Civil Liberties Union served nearly identical FOIA requests for
records upon local FBI offices in thirty-one states and the District of Columbia.  Choudhury
Decl. ¶ 3.  FBI records released in response to these requests make clear that the FBI has
exercised its DIOG authority unconstitutionally and illegally.  *See, e.g.*, American Civil Liberties
Union, Eye on the FBI: The FBI is Engaged in Unconstitutional Racial Profiling and Racial
"Mapping" (Oct. 20, 2011), http://bit.ly/Hqacap; American Civil Liberties Union, Eye on the
FBI: The FBI is Using the Guise of "Community Outreach" to Collect and Illegally Store
Intelligence Information on Americans' Political and Religious Beliefs (Dec. 1, 2011),
http://bit.ly/HqadeD; Jerry Markon, *FBI Illegally Using Community Outreach to Gather
Intelligence ACLU Alleges*, Wash. Post, Dec. 1, 2011, http://wapo.st/HqahLq.

After almost seven months passed without further disclosures, Plaintiff filed this action to enforce the Request on July 21, 2011, seeking an injunction requiring the Defendants to immediately process the Request, to conduct a thorough search for responsive records, and to release information unlawfully withheld.  Choudhury Decl. Ex. B (Compl. at 12–13) ("Request for Relief").[6]  Defendants answered the Complaint on August 29, 2011.  Answer, ECF No. 9. On September 29, 2011, the FBI released a partially redacted three-page document and stated that it was withholding information in the document and 628 additional pages under FOIA Exemptions.  Fancher Decl. ¶¶ 15–16, Ex. H; Hardy Decl. ¶ 13, Ex. H.  On October 28, 2011, the FBI released nine partially redacted pages and stated that it was withholding information from those pages and 615 additional pages pursuant to FOIA Exemptions.  Fancher Decl. ¶ 17, Ex. I; Hardy Decl. ¶ 14, Ex. I.

Pursuant to a schedule set by the Court, the parties proceeded to summary judgment motion practice.  March 9, 2012 Order, ECF No. 21.  In conjunction with their February 17, 2012 summary judgment motion, Defendants released 46 pages that were partially redacted to withhold information under FOIA Exemptions.  Fancher Decl. ¶ 18, Ex. J; Hardy Decl. ¶ 15, Ex. J.  Defendants' brief stated that Defendants were "reviewing again a relatively small number of pages of documents . . . ."  Defs.' Mot. for Summ. J., ECF No. 19, ("Defs.' Br.") 3 n.1.  On March 9, 2012, the FBI issued a final release of 36 partially redacted pages, with information withheld under FOIA Exemptions.  Fancher Decl. ¶ 19, Ex. K.

---

[6] Plaintiff also challenged Defendants' failure to timely respond to the Request and failure to grant Plaintiff's request for a public interest fee waiver and a limitation of fees.  The first claim is now mooted by Defendants' issuance of the final release after the litigation commenced, and the second claim is mooted by the FBI's representation in its September 29, 2011 letter that Plaintiff's request for a fee waiver is granted.  Fancher Decl. Ex. I; Hardy Decl. ¶ 9.

Defendants released a total of 250 pages of responsive records in full, and withheld 971 pages in full and 142 pages in part under Exemptions 1, 6, 7A, 7C, 7D and 7E.[7]

## ARGUMENT

### I.      Legal Standards

As the Sixth Circuit recognizes, the Freedom of Information Act "was enacted to permit access to official information long shielded unnecessarily from public view and . . . to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Schell v. U.S. Dep't of Health and Human Servs.*, 843 F.2d 933, 936 (6th Cir. 1988) (citing *EPA v. Mink*, 410 U.S. 73, 80 (1973)) (internal quotations omitted); *see also U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (purpose of FOIA is "broad disclosure" of government records). FOIA thus "ensure[s] an informed citizenry, vital to the functioning of a democratic society." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

To accomplish FOIA's purpose, in response to a request, agencies must conduct a search that is "adequate," demonstrates a "good faith effort," and "us[es] methods which can be reasonably expected to produce the information requested." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998). To demonstrate the adequacy of its search, "the agency may rely on affidavits or declarations that provide reasonable detail of the scope of the search." *Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 547 (6th Cir. 2001). Summary judgment may not be granted to an agency on a search claim if the "record leaves substantial doubt as to the sufficiency of the search." *Campbell*, 164 F.3d at 27.

FOIA "mandates disclosure of records . . . unless the documents fall within [FOIA's] exemptions." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001).

---

[7] Although Defendants asserted Exemption 3 over certain withholdings in the September 29, 2011 and October 28, 2011 releases, Defendants no longer defend their assertion of Exemption 3. Hardy Decl. ¶ 13 n.5.

The agency bears the burden of proving that information is properly withheld under a FOIA exemption.  *See id.* at 7–8; *John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 151–52 (1989).  FOIA exemptions are "narrowly construed" because "disclosure rather than secrecy is the dominant objective of the Act."  *Akron Standard Div. of Eagle-Picher Indus. v. Donovan*, 780 F.2d 568, 571 (6th Cir. 1986).  All doubts are to be resolved in favor of disclosure.  *Am. Civil Liberties Union v. Dep't of Def.*, 543 F.3d 59, 66 (2d Cir. 2008).

The agency also bears the burden of proving that information is properly withheld under a FOIA exemption.  *See Klamath Water Users Protective Ass'n*, 532 U.S. at 7–8; *John Doe Agency*, 493 U.S. at 151–52.  FOIA specifies that any reasonably segregable non-exempt portion of a record must be released.  *See* 5 U.S.C. § 552(b).

In order to meet its burden, the government must submit a declaration and index setting forth the bases for its claimed FOIA exemptions.  *See Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973).  In light of the tendency of federal agencies to "claim the broadest possible grounds for exemption for the greatest amount of information," defendant agencies are required to produce "a relatively detailed analysis" of the withheld material "in manageable segments" without resort to "conclusory and generalized allegations of exemptions."  *See id.* at 826–27.  The affidavits must "describe the withheld information with reasonable specificity, demonstrating a logical connection between the information and the claimed exemption."  *Abbotts v. Nuclear Regulatory Comm'n*, 766 F.2d 604, 606 (D.C. Cir. 1985) (internal citation omitted).

Courts review exemption claims *de novo,* and may examine documents *in camera*.  5 U.S.C. § 552(a)(4)(B).  When an agency invokes a national security exemption its affidavits

are typically afforded substantial weight, but only if they are not controverted by contrary evidence. *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009).

## II.     The FBI is an Agency Subject to FOIA and Should Not Be Dismissed as a Party.

Defendants contend that the Department of Justice ("DOJ") is the only proper defendant in this case because "[t]he FBI is a component of the DOJ and not an 'agency' as defined by the FOIA," and because dismissing the FBI as a defendant would have "no legal effect" on this case. Defs.' Br. 7–8. Their argument fails on both grounds.

Contrary to the government's assertion, the FBI is an "agency" for FOIA purposes. The FOIA incorporates the definition of "agency" set forth in the Administrative Procedure Act ("APA"). 5 U.S.C. § 552(f) (citing 5 U.S.C. § 551(1)). The APA definition includes "each authority of the Government of the United States, *whether or not it is within or subject to review by another agency*." 5 U.S.C. §551(1) (emphasis supplied). None of the decisions Defendants cite in support of their position address FOIA's incorporation of the APA definition of "agency." Defs.' Br. 8. Other courts, applying the full FOIA definition, have held that the FBI and other DOJ components are properly named defendants in FOIA actions. *See Cloonan v. Holder*, 768 F. Supp. 2d 154, 162 (D.D.C. 2011) ("naming components as defendants . . . is appropriate since the statute's plain language is clear"); *Sussman v. U.S. Marshals Serv.*, 808 F. Supp. 2d 192, 200 (D.D.C. 2011) (finding the FBI "to fall within the 'agency' definition of the APA, and thus the FOIA").[8] Indeed, "[n]o court has found that FOIA does *not* apply to the FBI." *Brown v. FBI*, 793 F. Supp. 2d. 368, 384–85 (D.D.C. 2011) (emphasis supplied). And the FBI has litigated numerous FOIA cases in its own name before the Supreme Court, the Sixth Circuit, and other

---

[8] *See also Lair v. Dep't of Treasury*, No. Civ. A. 03–827 (RCL), 2005 WL 645228, at *3 (D.D.C. Mar. 21, 2005) (naming components of executive departments as defendants "is proper"); *Prison Legal News v. Lappin*, 436 F. Supp. 2d 17, 22 (D.D.C. 2006) (finding the Bureau of Prisons a proper defendant to a FOIA action).

circuit courts.  *See, e.g., FBI v. Abramson*, 456 U.S. 615 (1982); *Ferguson v. FBI*, 83 F.3d 41 (2d Cir. 1996); *Williams v. FBI*, 69 F.3d 1155 (D.C. Cir. 1995); *Jones v. FBI*, 41 F.3d 238 (6th Cir. 1994); *Cunningham v. FBI*, 765 F.2d 61, 62 (6th Cir. 1985); *Kiraly v. FBI*, 728 F.2d 273, 279 (6th Cir. 1984), *cert. denied sub nom., Kiraly v. Clark*, 466 U.S. 959 (1984).

In a decision that provides persuasive authority to this Court, Chief Judge Lamberth of the U.S. District Court for the District of Columbia recently denied a similar motion to dismiss the FBI.  *Brown*, 793 F. Supp. 2d at 385.  As Judge Lamberth rightly held, dismissal of the FBI was "not required by statutory language or binding precedent" in light of "the plain meaning" of the FOIA and the number of D.C. Circuit cases holding "that the FBI may be a defendant" in FOIA suits.  *Id.* at 384–85.  Judge Lamberth also addressed and rejected Defendants' second argument in this case—that dismissing the FBI would have no "legal effect."  Judge Lamberth specifically held that substitution of DOJ for the FBI could "impede the purposes of the FOIA by preventing persons from receiving information in the most direct and efficient manner."  *Id.* at 384; *see also Peralta v. U.S. Attorney's Office*, 69 F. Supp. 2d 21, 26 (D.D.C. 1999); *cf. Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1049 (3d Cir. 1995) ("FOIA was intended to create an expedient tool for disseminating information and holding government accountable.").  For the same reasons, this Court should deny Defendants' motion to dismiss the FBI.

## III.    Defendants Have Not Demonstrated that the FBI Conducted a Reasonable Search.

Plaintiff merits summary judgment on its search claim for two independent reasons. First, Defendants' submissions explaining the FBI's search provide insufficient detail.  Second, the FBI's search methods as described by the Hardy Declaration were inadequate.

**1.** Defendants' declaration fails to provide sufficient detail to allow Plaintiff to properly challenge, and the Court to assess, the adequacy of Defendants' searches because they do not

10

describe how any of the offices instructed to search for responsive documents responded to those instructions.  The FBI Records/Information Dissemination Section ("RIDS") directed subdivisions of three FBI headquarters' offices to search "database systems" and "paper or manual files" for certain categories of responsive records.  Hardy Decl. ¶¶ 29–34.  Although the Hardy Declaration states that these offices sent "an all-employee e-mail" directing searches, it does not describe which paper or electronic databases were searched or how, or which search terms were used to search databases.  *Id.* ¶¶ 29, 34.  Nor does it sufficiently describe how the Detroit Field Office searched for records in response to a similar instruction.  *See id.* ¶ 38 (explaining that field office conducted eight-hour search and sent an "email canvass," but failing to address which files were searched or how, or what terms were used to search databases).  Defendants' failure to provide this information does not meet the FOIA's requirements.  *See Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) ("reasonably detailed affidavit" will "set[] forth the search terms and the type of search performed" on electronic databases); *see, e.g.*, *Negley v. FBI*, 658 F. Supp. 2d 50, 60 (D.D.C. 2009) (failure to describe search terms used "plainly violates" *Oglesby*); *cf. Rugiero*, 257 F.3d at 547 (affidavit identifying the computer system searched and explaining that it was searched by looking "for documents by name, date of birth, and social security number" was "model of responsiveness").

  The Hardy Declaration's lack of description for searches by these offices, which were the only offices to locate responsive documents, contrasts with its detailed description of the (ultimately futile) search of the FBI's Central Records System ("CRS").[9]  Without comparable detail, neither Plaintiff nor the Court can determine whether the search was "reasonably

---

[9] As the FBI itself admits, the CRS search was all-but-guaranteed from its inception not to yield responsive records: the Declaration acknowledges that the system is not set up for searches based on terms and is instead searchable only by the names of victims, suspects and common investigative subjects—not the type of information Plaintiff seeks.  Hardy Decl. ¶ 22.

calculated to discover the requested documents." *CareToLive v. FDA*, 631 F.3d 336, 340 (6th Cir. 2011); *see Church of Scientology of Cal. v. IRS*, 792 F.2d 146, 151 (D.C. Cir. 1986) (precluding summary judgment where affidavit fails to recite facts permitting court to "satisfy itself that all appropriate files have been searched, i.e., that further searches would be unreasonably burdensome").

   **2.** Defendants' search was also inadequate because the methods employed, as described in the Hardy Declaration, were not reasonably calculated to retrieve legal memoranda and policy documents, or certain types of field office records identified in the Request.

   The Hardy Declaration fails to show that the search was likely to locate requested legal memoranda and policy documents concerning the racial and ethnic information that the FBI may collect and use under the DIOG.  Fancher Decl. Ex. D at 2–4 (categories 1, 3, 5, 7, 9).  Although RIDS instructed the Detroit Field Office to search for these records, the field office reported that it searched "intelligence products and maps."  Hardy Decl. ¶¶ 35, 38.  But a search for legal memoranda and policy documents amongst "intelligence products or maps" is not "reasonably calculated to uncover" those documents.  *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350–52 (D.C. Cir. 1983).[10]

   Nor do Defendants describe a search that was reasonably calculated to retrieve responsive records concerning the field office's Domain Management intelligence activities, which Plaintiff specifically requested.  Fancher Decl. Ex. A at 1 (seeking racial and ethnic information used in

---

[10] Plaintiff directed the Request to the field office and its resident agencies because they necessarily retain legal, policy and training documents guiding their collection and use of Michigan communities' racial and ethnic information pursuant to the DIOG.  That components of headquarters searched for, and released, a handful of DIOG training materials, Hardy Decl. ¶ 34, does not cure the inadequacy in the Detroit Field Office's search.  Courts have made clear that the adequacy of a search is determined not by its results, but by the agency's methods. *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).

FBI's "domain awareness and "intelligence analysis activities") (internal citations ommited);

Choudhury Decl. Ex. A at 32–34 (DIOG § 4.3(C)(2)).  A DIOG training slide indicates that

Domain Management records "must be documented in an 800H-807H classification file." [11]

Choudhury Decl. Ex. D; *accord* Hardy Decl. ¶ 37 (noting RIDS' instruction to field office that

"most responsive documents" would be located in intelligence files).  But, the Hardy Declaration

provides no indication whether or how the field office searched these files, whether in paper or

electronic form.  The search as described was thus inadequate under the FOIA.  *See Nation*

*Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890–92 (D.C. Cir. 1995) (agency must search

record systems "that are likely to turn up the information requested"); *Raulerson v. Ashcroft*, 271

F. Supp. 2d 17, 22 (D.D.C. 2002) (agency must search record systems where "relevant

information might exist").  Neither the Defendants' asserted lack of bad faith, nor the possibility

that aspects of the search may have been reasonable cures their failure to use search methods

reasonably calculated to retrieve responsive Domain Management records.  *See Neugent v. U.S.*

*Dep't of the Interior*, 640 F.2d 386, 389–90 (D.C. Cir. 1981) (requiring further searches despite

agency's good faith and possibility that aspects of search were extensive).

     These "specific deficiencies" defeat the Defendants' motion for summary judgment.

*CareToLive*, 631 F.3d at 341–42; *see also Campbell*, 164 F.3d at 27 (precluding summary

judgment for agency where record left "substantial doubt" as to the search's adequacy).  The

Court should instead grant summary judgment to Plaintiff and order Defendants to conduct a

---

[11] Defendants withheld the name of this file series when they released the training slide in
response to the Request, but disclosed it in a different lawsuit.  *Compare* Hardy Decl. Ex. K at
DIOG PPD 256, *and* Supplemental Declaration of David M. Hardy Ex. A, *American Civil
Liberties Union of N.J. v. FBI*, 11 Civ. 2553 (D.N.J. Feb. 10. 2012), ECF 22-1.

thorough and expeditious search for responsive records and to submit a detailed affidavit describing that search.[12]

## IV.    Defendants Have Not Demonstrated That They Have Segregated and Disclosed All Non-Exempt Material From Documents Withheld in Full or in Part.

Defendants' withholding of 105 documents in full and 40 documents in part cannot be sustained because Defendants fail to show that they "disclose[d] segregable portions of otherwise nondisclosable material." *Am. Friends Serv. Comm. v. Dep't of Def.*, 831 F.2d 441, 445 (3d Cir. 1987).  The documents withheld in full are: seventy-nine maps; twenty-five Domain Intelligence Notes ("DINs"), which "study[] the activities and actions of a particular group or element" in the field office's area of responsibility; and one threat analysis Assessment, which compiles "the work product of a large number of DINS and other research materials."  Hardy Decl. ¶ 50, Ex. L. The documents withheld in part are fifteen Assessments and twenty-five electronic communications ("ECs"), which are "used to document the intelligence analysis and work product that has been used to create the Assessment or DIN." *Id.*[13]  Defendants principally claim that Exemption 7A permits withholding of the documents in full as protected law enforcement records, and secondarily assert that certain information within these documents is withholdable under Exemption 1 as classified information.  Defendants also contend that information redacted from the documents released in part is withholdable under Exemptions 7A and 1.  The Hardy Declaration asserts that no further information may be segregated and disclosed from any of the withholdings.  Hardy Decl. ¶ 93.[14]

_____

[12] Plaintiff does not seek discovery on the nature and scope of Defendants' search at this time, but reserves the right to do so if Defendants' search continues to be inadequate.

[13] Plaintiff does not challenge the information withheld from one partially released EC documenting the opening of a domain management investigation into Michigan's "large Middle Eastern and Muslim population."  Hardy Decl. Ex. K at DE-GEOMAP 483–86.

[14] Defendants assert Exemptions 1, 6, 7C, 7A, 7D and 7E to withhold certain information from

14

Plaintiff believes that due to the FBI's exercise of its DIOG authority, each document withheld in full or in part likely uses and relies on publicly-available racial or ethnic information about Michigan communities, including census data and demographics, that is not properly withholdable, and must be segregated and disclosed. *Sussman*, 494 F.3d at 1116 (segregability requirement applies to all FOIA exemptions); *EPIC v. Dep't of Justice*, 584 F. Supp. 2d 65, 72 (D.D.C. 2008) ("[N]onexempt factual information contained in an otherwise protected record must be disclosed unless it is inextricably intertwined or otherwise cannot be segregated from any [exempt] material.") (internal quotation marks omitted).   As detailed below, Defendants concede that the contested documents include such information, but have not released any of it. Although they bear the burden of demonstrating that such information cannot be segregated and disclosed, 5 U.S.C. § 552(a)(4)(B), they fail to meet this burden for four principal reasons.

**1**. First, Defendants do not provide the required factual support for their segregability determinations.  To meet their segregability burden under any claimed exemption, the Defendants must provide detailed affidavits that describe how the FBI made its segregability determination, offer a "detailed justification" for why materials withheld in full are not reasonably segregable, and indicate "what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977).  Although the Hardy Declaration

---

the documents withheld in full and those released in part.  In their summary judgment motion, however, Defendants ask to provide the Court with arguments *in camera* concerning Exemptions 7C, 7D, and 7E if they do not prevail on their Exemption 7A claim.  *See* Defs.' Br. 19 n.7.  In this cross-motion, Plaintiff does not oppose Defendants' summary judgment motion as to Exemptions 6, 7C, and 7D, and responds only to Defendants' Exemption 1 and 7A arguments as to information withheld from documents other than the DIOG training materials and Exemption 7E arguments as to the DIOG training materials.  Plaintiff objects, however, to Defendants' proposed submission of *in camera* arguments on Exemption 7E and, if Defendants proceed with their proposal, Plaintiff will present additional briefing on this issue and in response to Defendants' arguments concerning this exemption.

15

describes the process by which the FBI made its segregability determination, Hardy Decl. ¶ 93, it does not address what proportion of each document withheld in full contains non-exempt, publicly-available information, how such information is dispersed, or why it cannot be segregated and disclosed, *id*. ¶ 60 at 31–65.  Nor does it address why publicly-available racial or ethnic information cannot be reasonably segregated and disclosed from the redacted portions of the documents released in part.  *Id*. ¶ 60 at 67–75.  Without this "factual recitation" for each document, Defendants fail to carry their segregability burden.  *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 488 F.3d 178, 187 (3d Cir. 2007); *see Rugiero*, 257 F.3d at 553 (affidavit must offer "relatively detailed justification" for segregability determination).[15]  To the extent that Defendants argue that non-exempt information is so intertwined with exempt information in the documents as not to be segregable, this argument also lacks the required factual support.  *EPIC*, 584 F. Supp. 2d at 73–74.

**2**. Second, record evidence controverts Defendants' assertion that no racial or ethnic information can be segregated and disclosed.  *See Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 (D.C. Cir. 1991) (finding agency affidavit insufficient to support claim that no information could be segregated and disclosed where evidence showed otherwise).  As discussed in further detail below, Defendants have disclosed racial and ethnic information, including publicly–available census data and population statistics, from Domain Intelligence Notes, Assessments, ECs, and maps in response to the Request and similar FOIA requests in other states.  These disclosures "cast doubt" on the Hardy Declaration's claim that no further information can be segregated and disclosed.  *Powell*, 927 F.2d at 1243.  As a result, this Court should not grant the Hardy Declaration substantial weight, *Wilner*, 592 F.3d at 68, and should

---

[15] Nor have Defendants provided the factual description necessary to show that disclosure of segregable information would be unduly burdensome.  *See Mead Data Cent.*, 566 F.2d at 261.

either order disclosure of the non-exempt, racial or ethnic information in the documents, or conduct *in camera* review.

**3**. Third, Defendants must segregate and disclose publicly-available information revealing that the FBI is targeting Michigan communities based solely or primarily on their race, ethnicity, national origin, or religion because (a) the fact that the FBI is engaged in such targeting is public knowledge and, as such, further disclosure would not harm any ongoing investigations under Exemption 7A's harm prong, and (b) such targeting violates the DIOG and Guidance on Race, and thus cannot be withheld as a permissible "intelligence source or method" under Exemption 1.

Defendants may not rely on Exemption 7A to withhold from the contested documents public source information demonstrating the FBI's targeting of communities based solely or primarily on race, ethnicity, national origin, or religion.  Exemption 7A protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A); *Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1164 (3d Cir. 1995) (application of Exemption 7A requires showing that "release of the information could reasonably be expected to cause some articulable harm").  It is widely known, based on Defendants' disclosures responding to the Request and similar FOIA requests that the FBI has engaged in suspicionless investigations based on race, religion, national origin, and ethnicity.  For example, the Detroit Field Office documented the opening of a suspicionless Type 4 Domain Assessment on the ground that "[b]ecause Michigan has a large Middle-Eastern and Muslim population, it is prime territory for attempted radicalization and

recruitment" by terrorist groups "originat[ing] in the Middle-East and Southeast Asia.[16]  Hardy

Decl. Ex. K at DE-GEOMAP 484−85.  But the lack of any evidence connecting these Michigan

communities to wrongdoing or to the unnamed terrorist groups shows that shared national origin

and religion was the primary basis for opening that investigation.  Similarly, the San Francisco

FBI documented the opening of a domain assessment involving the mapping of Chinese and

Russian populations based only on the facts that Chinese and Russian organized crime syndicates

exist and that San Francisco has large ethnic Chinese and Russian populations.  Choudhury Decl.

Ex. J.[17]  These documents demonstrate the impermissible targeting of communities for

intelligence collection because of their race, ethnicity, national origin, or religion.  To the extent

that the disclosure of publicly-available information from Defendants' withholdings would

reveal further evidence of such targeting, that information could not "reasonably be expected to

cause some articulable harm" because it is widely known.  *Manna*, 51 F.3d at 1164.  It therefore

must be segregated and disclosed.

  Nor can Defendants withhold such information as an intelligence source or method under

Exemption 1.  Exemption 1 applies to information that is properly classified "in the interest of

national defense or foreign policy" pursuant to Executive Order 13,526.  5 U.S.C. § 552(b)(1).

Executive Order 13,526 in turn permits classification of information that "reasonably could be

expected to cause damage to national security," but makes clear that classification is not

permissible in order to "conceal violations of [the] law," or to "prevent embarrassment."  Exec.

---

[16] Choudhury Decl. Ex. A at 39, 45 (DIOG §§ 5.1, 5.4(A)(4)) (describing Type 4 domain
assessments); 2008 Attorney General's Guidelines, *supra* note 2, at 7 (authorizing opening of
domain assessments without objective information suggesting the possibility of misconduct,
based on an FBI agent's subjective determination that he or she is acting with an authorized
purpose to prevent crime or a threat to national security).
[17] Pursuant to the DIOG, the FBI may collect, use, and map communities' racial and ethnic
information in the course of Type 4 domain assessments.  Choudhury Decl. Ex. A. at 32-33
(DIOG § 4.3(C)(2)).

Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) §§ 1.1(a), 1.7(a).  As the DIOG acknowledges, DOJ's Guidance on Race prohibits the use of race, ethnicity, national origin, or religion as the sole basis for investigation, and the DIOG itself prohibits "dominant" or "primary" reliance on these factors as a matter of FBI policy.  Choudhury Decl. Ex. A (DIOG § 4.3(A)−(B)).  Thus, information showing the FBI's sole or primary reliance on any of these factors cannot fall within the Executive Order's authorized withholding category for "intelligence activities (including covert action), intelligence sources or methods."  Exec. Order 13,526 §§ 1.1(a), 1.4(d); *see Founding Church of Scientology v. Nat'l Sec. Agency*, 610 F.2d 824 n. 49 (D.C. Cir. 1979) (agency has "no protectable interest in suppressing information simply because its release might uncloak an illegal operation," although it may have another basis for proper withholding).[18]

**4**. Defendants contend that segregation is not possible because the records contain "highly sensitive law enforcement and intelligence information that is covered by more than one FOIA exemption."  Defs.' Br. 30.  But, they offer no authority for the extraordinary proposition that when information in a record is covered by more than one FOIA exemption, Defendants are freed from their burden of disclosing the reasonably segregable *non-exempt* information in the record.  *Id*.  Instead, Defendants provide impermissibly categorical and conclusory assertions that no non-exempt material may be segregated and disclosed from documents withheld in full. *See, e.g.,* Hardy Decl. ¶¶ 40, 59, 93 (each containing general, categorical assertions).  As Plaintiff discusses more specifically below with respect to each category of document, these statements are precisely the sort of "blanket declaration that all facts are so intertwined [as] to

---

[18] A prerequisite for classification is that the information must fall within one of the Executive Order's authorized withholding categories, Exec. Order 13,526 § 1.1(a), which include "intelligence sources or methods" and "foreign relations or foreign activities of the United States, including confidential sources," *id*. § 1.4 (c)–(d).

19

prevent disclosure" that are insufficient to explain why an agency has not disclosed segregable information. *EPIC*, 584 F. Supp. 2d at 74.

      **a. Domain Intelligence Notes:** Although Defendants acknowledge that the Domain Intelligence Notes and their appended maps contain public source information, they fail to provide an adequate, factual recitation to justify their refusal to segregate and disclose this information. *See, e.g.*, Hardy Decl. ¶ 60 at 48 (DIN identifies "publicly available resources" consulted ); *id.* ¶ 50 (DINs record and analyze "data"); *id.* ¶ 54–55 ("public source data" used in DINs over which Exemption 1 is claimed).

      Defendants' asserted inability to segregate publicly-available information from the DINs is also controverted by record evidence. For example, Defendants released a Domain Intelligence Note showing FBI use of census figures on Hispanics, African Americans, and individuals of Central American origin in New Jersey; a chart of "New Jersey's top five Hispanic populated counties"; and a map concerning populations from "El Salvador, Honduras Guatemala." Choudhury Decl. Ex. E at 1, 4, 11. Defendants similarly segregated and disclosed Hispanic, Central American-born, and African American population statistics from Domain Intelligence Notes from FBI field offices in Alabama and Georgia. Choudhury Decl. Ex. F–G.[19] These disclosures show that Defendants can segregate and disclose publicly-available racial and ethnic information from the DINs. *See Abdelfattah*, 488 F.3d at 187.

      <u>Exemption 7A:</u> Defendants further fail to demonstrate that publicly-available information in the twenty-five DINs is withholdable under Exemption 7A. For Exemption 7A to apply,

---

[19] These documents also substantiate Plaintiff's concern that the FBI is inappropriately tracking communities based on race, ethnicity, and national origin to examine threats. *See, e.g.*, Choudhury Decl. Ex. E at 1 (tracking communities from Mexico, Cuba, the Dominican Republic, Colombia, and Puerto Rico); Choudhury Decl. Ex. H at 3 (tracking communities from the Dominican Republic).

Defendants must offer more than "conclusory" statements showing how the "particular kinds of investigatory records" sought "would interfere with a pending enforcement proceeding." *Campbell v. Dep't of Health and Human Servs.*, 682 F.2d 256, 259 (D.C. Cir. 1982).[20] But, Defendants offer nothing more than conclusory statements that fail to meet their burden. *See, e.g.*, Hardy Decl. ¶ 59 (containing generic assertion for all documents); *id.* ¶ 60 at 48−66 (claiming for each DIN that disclosure of information would harm investigations without specifically addressing public source information in the documents).

Defendants contend that they are simply relying on a recognized "categorical approach" to Exemption 7A. Defs.' Br. 18. But, even when an agency groups documents into categories that are "sufficiently distinct to allow a court to grasp how each category of documents, if disclosed, would interfere with the investigation," it still must explain with sufficient specificity "how the release of each category would interfere with enforcement proceedings." *Manna*, 815 F. Supp. at 806 (internal alterations and citation omitted); *North v. Walsh*, 881 F.2d 1088, 1097 (D.C. Cir. 1989) (agency must show that disclosure "would, in some particular, discernible way, disrupt, impede, or otherwise harm the enforcement proceeding"). Defendants fail to do so.

To be clear, Plaintiff does not seek the names or descriptions of investigation targets. Defendants do not show that release of the specific public source information that Plaintiff *does* seek—information about racial and ethnic communities, such as census data and population statistics—would be reasonably expected to enable investigation targets to "change their

---

[20] Plaintiff does not dispute that the withheld documents were compiled for law enforcement purposes or that Defendants have identified pending investigations, in some instances. *See Rugiero*, 257 F.3d at 550 (adopting "per se rule under which any documents compiled by a law enforcement agency" satisfy first requirement of Exemption 7); *Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1164 (3d Cir. 1995) (requiring a law enforcement proceeding that "is pending or prospective" for Exemption 7A to apply).

behavior," "establish defenses or fraudulent alibis," "destroy or alter evidence," or intimidate witnesses, absent accompanying disclosure of target names or descriptors.  Defs.' Br. 18−19; *cf. Dickerson v. Dep't of Justice*, 992 F.2d 1426, 1433 (6th Cir. 1993) (although government properly asserted Exemption 7A over *non-public* information from active investigation files, it disclosed *public* source information from the files).  Finally, Defendants may not withhold the FBI's use of publicly-available racial or ethnic information to target communities for investigation or intelligence gathering solely or primarily because of their race, ethnicity, or national origin, on the ground that disclosure would result in harm to an enforcement proceeding because this targeting is already widely known.  *See discussion supra* 17−18.

Exemption 1: Defendants also do not carry their burden for withholding certain information from seventeen DINs as classified information subject to Exemption 1.  Defendants' submissions do not address with the requisite specificity why disclosure of the publicly-available racial or ethnic information in these DINs, or the FBI's use of it, would reveal any intelligence sources or methods.  *See* Hardy Decl. ¶ 51−53.  While the Hardy Declaration asserts Exemption 1 over some (not all) information within these DINs, it does not specify whether it claims exemption to withhold the publicly-available information within these documents.  *See, e.g.*, *id.* ¶ 60 at 48−55, 57−58, 60−66 (claiming Exemption 1 over "[i]nformation within" seventeen DINs). Defendants' categorical assertion that disclosure of *any* sources of information used by the analysts who created the DINs would harm national security by permitting investigation targets to "change their behaviors" is thus unsupported and unpersuasive.  Hardy Decl. ¶ 51; *see Halpern v. FBI*, 181 F.3d 279, 293 (2d Cir. 1999) (rejecting agency's summary assertion that disclosure would "automatically reveal . . . intelligence-gathering capabilities").

Similarly, Defendants' bare, conclusory, and categorical assertions that information within eight DINs are classified because they fall within the Executive Order's withholding category for information concerning foreign activities or foreign relations are insufficient to permit withholding of publicly-available information. *See* Defs.' Br. 15; Hardy Decl. ¶¶ 54–55. Although the Defendants cite Section 1.4(c)–(d) of Executive Order 13,526 to support their withholding of the DINs under Exemption 1, Hardy Decl. ¶¶ 49, 54, 55, they fail to explain "both why the material has been kept secret and why such secrecy is allowed by the terms of [the] executive order." *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 265 F. Supp. 2d 20, 27 (D.D.C. 2003). And, as discussed above, to the extent that these seventeen DINs contain public source information showing impermissible FBI targeting of communities for investigation or intelligence gathering solely or primarily because of their race, ethnicity, national origin or religion, this practice violates the Guidance on Race and DIOG, and cannot be an intelligence source or method withholdable under Exemption 1. *See discussion supra* 18–19.

**b. Program Assessments**: Defendants acknowledge that the sixteen Program Assessments contain public source information, including census data and population statistics. Hardy Decl. ¶ 60 at 32, 35–40, 43 (public source websites or data used to create Assessments); *id.* ¶ 60 at 33, 35, 36, 38, 39 (Assessments include maps showing "specific population concentrations" or "population data"). But, they offer no justification for withholding these non–exempt portions other than the conclusory, catch all statement provided for all withholdings. *See* Hardy Decl. ¶ 93.[21] Defendants thus fail to factually support their refusal to

---

[21] Following Defendants' filing of their Motion for Summary Judgment, Defendants released in part the first two pages of fifteen of the sixteen Program Assessments. Choudhury Decl. ¶ 5 & Ex. N (partial release of DE-GEOMAP 299-300, 461, 491-92, 569, 618-19, 661-62, 691-92, 718, 1109-10, 1196-97,1226-27, 1248-49, 1275-76, 1291-92, 1371-72, 1479-80); Hardy Decl. Ex. L at 1-10 (identifying sixteen Program Assessments initially withheld in full). The vast majority of

segregate and disclose publicly-available information from these lengthy documents. *See Abdelfattah*, 488 F.3d at 187; *Rugiero*, 257 F.3d at 553; *see, e.g.*, Hardy Decl. ¶ 60 at 31 (failing to describe where "census reports" and information from "public source reports" is located or how it is dispersed in 162-page Assessment); *id*. ¶ 60 at 35 (same for "population" information and "public source data" in 30-page Assessment).

Moreover, record evidence controverts Defendants' determination that publicly-available information cannot be segregated and disclosed from the Program Assessments. For example, the FBI released an electronic communication documenting the "2009 Division Domain Assessment" of the FBI's Sacramento Field Office, which, like the Program Assessments described here, "identif[ies] and forecast[s] the top threats" for the FBI division and provides a "threat summary of several Domain Intelligence Notes (DINs)." Choudhury Decl. Ex. I; *cf.* Hardy Decl. ¶ 60 at 32 (Overall Domain Assessment summarizes and ranks Detroit Division's "top threats and top emerging threats"). The Sacramento document shows that non-exempt information in the Program Assessments may be segregated and disclosed, notwithstanding the Hardy Declaration's assertions.

Exemption 7A: Defendants fail to meet their burden of withholding sixteen Program Assessments in their entirety under Exemption 7A. As with the Domain Intelligence Notes, Defendants' submissions do not show how disclosure of the publicly-available information Plaintiff seeks could be reasonably expected to harm specific ongoing or likely enforcement proceedings, particularly since Plaintiff does not seek target names or descriptions. *See Campbell*, 682 F.2d at 259; *see discussion supra* 20-22. To the extent that such information would reveal that the FBI is collecting, using, or mapping Michigan communities' racial or

these lengthy documents, which range from fifteen to 162 pages, remain withheld.

24

ethnic information in the course of threat analysis, this information is not withholdable under

Exemption 7A because this practice is widely known and its further disclosure cannot be

reasonably expected to interfere with enforcement proceedings.  *See* Choudhury Decl. Ex. A at

33 (DIOG § 4.3(C)(2)); *id.* at Ex. B. (Compl. ¶ 18) (citing press reports of FBI's racial and ethnic

mapping under the DIOG); *see also discussion supra* 17−18.

      <u>Exemption 1</u>: Defendants also fail to carry their burden of withholding any

publicly−available information in ten Program Assessments under Exemption 1 for the same

reasons that they fail to carry this burden with respect to the DINs.  *See discussion supra* 22−23;

*see* Defs.' Br. 15−16; Hardy Decl. ¶ 49−55; *see Halpern*, 181 F.3d at 293 (requiring more than

summary assertions of harm for Exemption 1 to apply).  The Hardy Declaration offers no

additional support for withholding information from the Program Assessments under Exemption

1, and asserts in only general and conclusory fashion, without reference to specific portions of

the documents, that disclosure of information could reveal classified techniques or harm national

security.  Hardy Decl. ¶¶ 50−55, 60 at 31−34, 37-38, 40−41.  This lack of detail precludes

granting substantial weight to the Hardy Declaration's assertions concerning the harm that would

result from further segregation and disclosure.  *Am. Civil Liberties Union*, 265 F. Supp. 2d at 28.

      **c. Electronic Communications ("ECs"):**  As with the other documents, Defendants fail

to meet their burden of factually supporting their determination that no further non-exempt

information may be segregated and disclosed from the twenty-six partially redacted ECs.  *See*

*discussion supra* 15−16, 20−21, 23−24; *see, e.g.*, Hardy Decl. ¶ 60 at 67−75 (failing to describe

where public source information is located in redactions or how it is dispersed through

document).  Without the requisite specificity, Defendants do not justify their failure to segregate

and disclose publicly-available racial and ethnic information from the ECs.

Although the ECs have been released with redactions, contrary evidence in the record demonstrates that these documents likely contain additional, non-exempt information that may be segregated and disclosed, such as information identifying racial or ethnic communities, census data, and population statistics. *See, e.g.*, Hardy Decl. Ex. K at DE-GEOMAP 484−86 (EC disclosing opening of domain assessment based on Michigan's "large Middle-Eastern and Muslim population"); Choudhury Decl. at Ex. J−K (disclosing opening of domain assessment based on size of "Chinese population" and "sizeable Russian population"); *see also* Choudhury Decl. Ex. E at 1, 4−5 (segregating and disclosing census figures), Ex. F at 2 (same), Ex. G at 2 (same), Ex. L at 2 (same). This evidence squarely rebuts the Hardy Declaration's claim that all reasonably segregable information was disclosed from the ECs.

Exemption 7A: Nor have Defendants shown that racial or ethnic information is properly withheld from the ECs under Exemption 7A. Defendants have already revealed that the FBI has opened a Type 4 Domain Assessment involving the collection and mapping of Michigan's Middle Eastern and Muslim communities on the basis of an unsubstantiated connection between these communities and overseas terrorist groups. Hardy Decl. Ex. K at DE-GEOMAP 484−85. Disclosure of further publicly-available information from the ECs revealing this intelligence program or the FBI's collection or use of racial or ethnic information could not be reasonably expected to cause "articulable harm" to any ongoing investigation or proceeding, as discussed above. *Manna*, 51 F.3d at 1164; *see discussion supra* 17−18, 20−22, 24.

Exemption 1: As with the DINs and Program Assessments, Defendants fail to meet their burden of showing that publicly-available information within twelve of the ECs is properly withheld under Exemption 1. Even if the documents contain some information concerning the "FBI's intelligence activities and methods," Defendants have not shown that publicly available

census data or population statistics, the FBI's use of such information, or the FBI's targeting of communities on the sole or primary basis of prohibited characteristics, fall into this category. Defs.' Br. 16; *see discussion supra* 18, 22–23, 25.

**d. Maps:** Defendants do not make the factual showing required to justify their failure to disclose reasonably segregable, non-exempt information from seventy-nine maps that are not tied to other documents.  Hardy Decl. ¶ 60 at 44–47.  The Hardy Declaration's descriptions of these maps make clear that they do not depict individuals or groups reasonably suspected of wrongdoing, but rather public source information, or at least *some* public source information, concerning geographic areas of concern, population statistics, and the identities of towns and cities.  *See, e.g.*, Hardy Decl. Ex. K at DE-GEOMAP 607 ("Map of the Detroit Domain – Documenting Population Data from public sources, separated by specific countries of origin"); *id*. at DE-GEOMAP 610, 613 ("Map of the Detroit Domain – Documenting Population Data from public sources, notating a specific concentration from a particular country"); *id*. at DE-GEOMAP 739 ("Map of the Detroit Domain – Documenting businesses in the area of responsibility").  Defendants do not meet their burden to provide a sufficiently detailed justification for their refusal to segregate and disclose publicly-available information from the maps because they offer nothing but the same broad and conclusory justification offered for all documents.  *See* Hardy Decl. ¶ 93; *see a*lso *Abdelfattah*, 488 F.3d at 187; *discussion supra* 15–16.

Moreover, contrary evidence in the record shows that Defendants can segregate and disclose non-exempt information from maps and related depictions of mapped data, as they have with other documents.  *See, e.g.*, Choudhury Decl. Ex. E at 11 (disclosing that map depicted populations from "El Salvador, Honduras, Guatemala" in field office's area of responsibility);

Choudhury Decl. Ex. M (disclosing mapping of "Islamic Centers & Mosques" and "Islamic Institutions & Mosques" in FBI's Knoxville Division).

Exemption 7A: Defendants do not adequately explain how disclosure of public source information from any of the maps, particularly census data or populations statistics, could reasonably be expected to compromise ongoing investigations absent the accompanying disclosure of target identities and descriptors, which Plaintiff does not seek. *See* Hardy Decl. ¶ 59; *Campbell*, 682 F.2d at 259. Defendants disclosure of non-exempt information from maps in response to similar FOIA requests shows that similar disclosures may be made here. For example, Defendants' release of a map showing that the FBI is mapping "Tennessee Islamic Centers & Mosques" provided important information to the requester without disclosing the identity or description of any targets. Choudhury Decl. Ex. M. Similarly, Defendants released a map showing that the FBI tracked three New Jersey communities on the basis of national origin in the course of investigating the MS-13 gang. Choudhury Decl. Ex. E at 11. Even if the identity of the target had been withheld, disclosure of identities of the communities would have provided important information responsive to the Request. Finally, to the extent that publicly-available information in the maps demonstrates impermissible FBI targeting of communities for investigation or intelligence collection based solely or primarily on protected categories, that practice is widely known, improperly withheld under Exemption 7A, and must be segregated and disclosed. *See discussion supra* 17−18.

Exemption 1: Defendants do not adequately explain why publicly-available racial and ethnic information in six maps is withholdable as intelligence sources or methods under Exemption 1 for the same reasons they fail to sufficiently explain their other Exemption 1 withholdings. *See discussion supra* 18−19, 22−23, 25, 26. They particularly fail to describe how

28

disclosure of this narrow category of information will reveal the "sources and focus of the FBI's intelligence activities," Defs.' Br. 17, when it is already widely known that the FBI uses census data, population statistics and other racial and ethnic information in the course of intelligence activities.  Choudhury Decl. Ex A at 33 (DIOG § 4.3(C)(2)), Ex. B (Compl. ¶ 18) (citing press reports of FBI's of Racial and ethnic mapping program under the DIOG).[22]

The Court should thus grant summary judgment to Plaintiff on the issue of segregability and should order Defendants to disclose segregable non-exempt material from the documents withheld in full, or in the alternative, review *in camera* unexpurgated versions of these records to determine what segregable, non-exempt material exists and order it disclosed.

**V.   Defendants' Submissions Do Not Sufficiently Detail Their Basis for Withholding DIOG Training Materials Under Exemption 7.**

Defendants' submissions do not adequately justify their withholding under Exemption 7E of DIOG training materials providing hypothetical examples concerning the permissibility of using race, ethnicity, national origin, religion, or the exercise of First Amendment rights in opening FBI investigations and assessments.  Hardy Decl. Ex. K at DIOG PPD 65−66, 123−24, 209−11, 239−40, 291−92.  These training slides address an issue of critical importance to Michigan communities: FBI agents' compliance with the Constitution and the Privacy Act in targeting investigations and suspicionless assessments.  *See* U.S. Const. amend. XIV § 1 (guaranteeing equal protection of the law); 5 U.S.C. § 552a(e)(7) (prohibiting maintenance of federal records describing an individual's exercise of First Amendment rights in all but the most limited circumstances).

---

[22] Documents obtained by ACLU affiliates across the country have shown that this practice is a routine part of the FBI's nationwide Domain Management Intelligence program.  *See* American Civil Liberties Union, Eye on the FBI: The FBI is Engaged in Unconstitutional Racial Profiling and Racial "Mapping," *supra* note 6.

Exemption 7(E) permits the withholding of two categories of law enforcement information: those that, if released, "would disclose techniques and procedures"; and those that would reasonably risk circumvention of the law if "guidelines for law enforcement investigations or prosecutions are disclosed." 5 U.S.C. § 552(b)(7)(E); *see Allard K. Lowenstein Int'l Human Rights Project v. U.S. Dep't of Homeland Sec.*, 626 F.3d 678, 680–82 (2d Cir. 2010) (discussing Exemption 7E). To demonstrate a "risk of circumvention of the law," Defendants must show that the law enforcement rules they seek to withhold are not well known to the public. *See Rosenfeld v. Dep't of Justice*, 57 F.3d 803, 815 (9th Cir. 1995) (recognizing "routine-technique" exception to Exemption 7E). The Defendants must also provide sufficient information for the Court to determine whether Exemption 7E applies. *Boyd v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, Civil Action No.: 05-1096, 2006 WL 2844912, *9 (D.D.C. Sept. 29, 2006).

Defendants' claim that disclosure of the hypothetical examples Plaintiff seeks would permit circumvention of the law lacks the specificity necessary to meet their FOIA burden. *See* Defs.' Br. 29. Their broad assertion that disclosure of these guidelines would "cripple" the effectiveness of investigations and assessments is inapplicable to these particular slides, which appear to provide guidance to FBI agents on how to follow the law. Defendants' explanation is precisely the sort of "boilerplate language and [] conclusion[]," *Bay Area Lawyers for Nuclear Arms Control v. Dep't of State*, 818 F. Supp. 1291, 1299 (N.D. Cal. 1992), lacking "contextual description . . . of the documents . . . or of the specific redactions" that courts reject. *Halpern*, 181 F.3d at 293. Such "categorical descriptions" of redacted material coupled with generalized assertions of anticipated harms from disclosure are "clearly inadequate." *King v. U.S. Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987). Similarly, Defendants' general assertion that

30

disclosure of the requested information would reveal law enforcement techniques, Defs.' Br. 28,

is insufficiently "tied to the content of the specific redactions" to be "useful in evaluating the

propriety of the decision to withhold." *Davin*, 60 F.3d at 1051.

The Court should thus order Defendants to disclose the information redacted from the

identified DIOG training slides.

**VI.    The Court Should Adjudicate Defendants' Possible Invocation of FOIA Section 552(c) Through a Procedure Affording Meaningful Judicial Review and Public Access to Judicial Opinions.**

Plaintiff believes that the FBI may be withholding information from disclosure under

FOIA Section 552(c), which provides that in certain, limited circumstances, the FBI may treat

otherwise responsive records "as not subject to the [FOIA] requirements" without informing the

FOIA requester.  5 U.S.C. § 552(c)(1)–(c)(3).  Plaintiff requests that this Court review

Defendants' possible reliance on Section 552(c)(3) through a Glomar-like procedure that affords

meaningful judicial review and public access to judicial opinions, as described below.

**1.    This Court Should Review the Propriety of Defendants' Reliance, if Any, on FOIA Section 552(c).**

FOIA Section 552(c)(3) permits the FBI to exclude records from disclosure if they are

properly withholdable under  Exemption 1 (permitting withholding of classified national defense

or foreign policy information), pertain to a foreign intelligence, counterintelligence, or

international terrorism investigation, and if the very existence of the records is properly classified

information.  *Id*. § 552(c)(3).  When a FOIA plaintiff raises concern that the FBI may be relying

upon Section 552(c), the court must determine whether the FBI did so and, if it did, adjudicate

whether reliance complied with statutory requirements.  *Benavides v. DEA*, 968 F.2d 1243, 1246,

1249 (D.C. Cir.), *modified on reh'g by* 976 F.2d 751 (D.C. Cir. 1992) (holding that district court

erred by refusing to review applicability of 5 U.S.C. § 552(c)(2) where plaintiff challenged its

application); Harry A. Hammit, et al., Litigation Under the Federal Open Government Laws 2008 336 (2008) ("[J]udicial review may occur . . . when the recipient suspects that the agency has resorted to the exclusion mechanism . . . ."); *see, e.g.*, *Islamic Shura Council v. FBI*, 779 F. Supp. 2d 1114, 1126 (C.D. Cal. 2011) (reviewing agency reliance on Section 552(c) *in camera* and concluding that "Plaintiffs are not entitled to any further information").

Although Plaintiff need not make a showing to support its concern that Defendants may be relying on Section 552(c)(3), it has two strong bases for that concern.  First, Defendants' search for documents, and its result, are inadequate for the reasons set forth above.  Second, Defendants identified withheld documents concerning categories of information that may fall within Section 552(c)(3): documents concerning foreign intelligence or counterintelligence threats, Hardy Decl. Ex. L at 11, 20–22, international terrorism crimes or threats, *id*. at 10, 11, 13, or foreign or international extremist groups or terrorist organizations, *id*. at 2, 3, 12, 24; and documents that if disclosed would harm foreign relations or foreign activities of the United States, Hardy Decl. ¶¶ 54–5.  These documents suggest that related, responsive documents concerning foreign intelligence, counterintelligence, or international terrorism investigations may exist, but Defendants' relied on Section 552(c)(3) to exclude them.  Plaintiff therefore requests the Court to adjudicate whether Defendants reliance, if any, on Section 552(c)(3) was proper.

### 2. A Glomar-Like Process for Adjudicating the Section 552(c) Issue Will Permit Meaningful Judicial Review and Protect the Interests of the Litigants and the Public.

Plaintiff proposes that the Court adopt a procedure for reviewing Defendants' possible reliance on Section 552(c)(3) that is akin to the Glomar procedure established by the D.C. Circuit in *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), and followed by other circuits to accommodate those narrow circumstances in which an agency may properly refuse to confirm or

deny the existence of records.  *See, e.g.*, *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir.

2009); *Bassiouni v. CIA*, 392 F.3d 244, 246 (7th Cir. 2004); *Minier v. CIA,* 88 F.3d 796, 800–02

(9th Cir. 1996); *Lame v. U.S. Dep't of Justice*, 654 F.2d 917, 921 (3d Cir. 1981).

The normal FOIA practice requires an agency to search for responsive records, release

nonexempt records, and then provide a detailed justification for any withholdings to the requester

and the court.  *Vaughn*, 484 F.2d at 826–28.  In limited circumstances, where an agency claims

that its very confirmation or denial of the existence of records requested under the FOIA would

"cause harm cognizable under a FOIA exception," agencies are permitted to invoke the Glomar

procedure.  *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007); *see Phillippi*, 546 F.2d 1009; *cf.* 5

U.S.C. § 552(c)(3) (requiring the very existence of the requested records to be classified

information for Section 552(c)(3) to apply).

In the Glomar procedure, an agency may respond to a FOIA requester by stating publicly

that it interprets the request as seeking records that, if they exist, would be excludable under

FOIA and thus have not been processed.  *See, e.g.*, *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161,

1171–72 (D.C. Cir. 2011); *Moore v. CIA*, 666 F.3d 1330, 1331 (D.C. Cir. 2011).  The parties

then brief, and the court resolves, whether the fact of the existence of the records sought is itself

exempt from disclosure.[23]

Plaintiff requests that the Court require Defendants to respond to Plaintiff's concern that

they may have relied upon Section 552(c)(3) with a similar statement: a public court filing

indicating whether Defendants interpret all or part of Plaintiff's FOIA request as seeking records

that, if they exist, would be excludable under Section 552(c), and that therefore, Defendants have

---

[23] *See, e.g.*, *Wolf*, 473 F.3d at 375 ("The question, then, is whether the existence of Agency
records regarding an individual foreign national constitutes information itself protected by either
FOIA Exemption 1 or Exemption 3.").

not processed those portions of the Request.[24]  Just as in the Glomar context, such a statement would not reveal whether Defendants have invoked Section 552(c) or whether they in fact have responsive records.  If Defendants file a statement that they *do* interpret Plaintiff's FOIA request as seeking records that would, if they exist, fall under Section 552(c), Plaintiff would brief to this Court its argument that the types of records sought, if they exist, would *not* fall within the exclusion.  The Court would then determine, as courts commonly do in response to Glomar invocations, whether the type of information sought by Plaintiff, if it exists, is excludable under Section 552(c).  As in the Glomar context, the Court would then issue a public opinion that would simply address the question of whether such records, if they existed, fall within the statutory language of Section 552(c).  If Defendants prevail, the Court would issue a public opinion that states, at a minimum, "The type of records sought by all or a portion of Plaintiff's FOIA request would be excludable under Section 552(c), if any such records exist."  If Plaintiff prevails, the Court's public opinion would state, at a minimum, "The type of records sought by all or a portion of Plaintiff's FOIA request are not excludable under Section 552(c), and therefore the government must process Plaintiff's request to determine whether any such records exist."

This Court should adopt the proposed Glomar-like procedure, which is familiar to courts and litigants around the country and is preferable to any alternative, such as secret, *ex parte* litigation conducted entirely *in camera*, for three principal reasons.[25]

First, the procedure would promote this Court's meaningful judicial review because the Court would benefit from both parties' briefing concerning the question of whether any of the

---

[24] As is the norm under Glomar, if Defendants do not interpret Plaintiff's request as seeking such records, their public court filing would so indicate.

[25] Although the few courts that have adjudicated the government's possible reliance on Section 552(c) have apparently proceeded entirely *in camera*, such a procedure is disfavored for the reasons set forth below.

34

requested records, if they exist, fall within Section 552(c)(3)'s statutory language. Second, the procedure would permit the Court to issue a public opinion that conveys sufficient information concerning its reasoning so as to permit meaningful appellate review and to enable Plaintiff to determine whether to exercise its right to an appeal.[26] Third, the procedure permits the Court to fulfill its obligation to provide the public with access to the judicial process and its outcomes under the First Amendment and the common law.[27] Because the parties' briefing and the Court's opinion would address a hypothetical question—whether any of the requested records, *if they exist*, fall under Section 552(c)—there would be no need for sealed filings or a sealed opinion. *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348–49 (7th Cir. 2006) (unsealing district court opinion and emphasizing, "What happens in the federal courts is presumptively open to public scrutiny . . . We hope never to encounter another sealed opinion.").

Plaintiff thus asks the Court to follow this Glomar-like procedure and, as the initial step, to order Defendants to make a public court filing indicating whether they interpret all or part of Plaintiff's FOIA request as seeking records that, if they exist, would be excludable under Section 552(c), and that therefore, Defendants have not processed those portions of the Request.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment and grant Plaintiff's cross-motion for summary judgment.

---

[26] *Cf. Granite Auto Leasing Corp. v. Carter Mfg. Co*., 546 F.2d 654, 656 (5th Cir. 1977) ("When an order granting summary judgment is opaque and unilluminating as to either the relevant facts or the law with respect to the merits of [a] claim, an appellate court has no basis upon which to affirm the judgment."(internal citation and quotation marks omitted)).

[27] *See, e.g.*, *Press-Enter. Co. v. Superior Ct. of Cal.*, 464 U.S. 501, 510 (1984) (presumption of public access to the activities of the judiciary is overcome only in the rarest and most compelling of circumstances.); *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978) (common law right of access to "judicial records and documents"); *Kamakana v. City & Cnty of Honolulu*, 447 F.3d 1172, 1179 (9th Cir, 2006) ("[T]he strong presumption of access to judicial records applies fully to dispositive pleadings.").

s/Nusrat Choudhury
Nusrat Choudhury (*Admission Pending*)
Hina Shamsi (*Admission Pending*)
National Security Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7876
nchoudhury@aclu.org
hshamsi@aclu.org

s/Stephen C. Borgsdorf
Stephen C. Borgsdorf (P67669)
Dykema Gossett PLLC
Cooperating Attorneys, American Civil Liberties
  Fund of Michigan
2723 South State Street, Suite 400
Ann Arbor, MI 48104
(734) 214-7663
sborgsdorf@dykema.com

s/Mark P. Fancher
Mark P. Fancher (P56223)
Michael J. Steinberg (P43085)
American Civil Liberties Union Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6822
mfancher@aclumich.org
msteinberg@aclumich.org

*Attorneys for Plaintiff*

April 10, 2012

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2012, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to counsel of record.

<div style="margin-left: 40%;">

<u>/s/ Stephen C. Borgsdorf</u>
Stephen C. Borgsdorf (P67669)
Cooperating Attorney, American Civil
Liberties Fund of Michigan
DYKEMA GOSSETT PLLC
2723 South State Street, Suite 400
Ann Arbor, MI  48104
(734) 214-7660
sborgsdorf@dykema.com

</div>