**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

AMERICAN CIVIL LIBERTIES
UNION OF MICHIGAN,

       Plaintiff,

v.                                    Case No. 11-13154
                                         Hon. Lawrence P. Zatkoff

FEDERAL BUREAU OF
INVESTIGATION, and UNITED STATES
DEPARTMENT OF JUSTICE

       Defendants.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on September 30, 2012

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on the parties' cross Motions for Summary Judgment [dkt 19, 25]. The parties have fully briefed the motions. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1 (f)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the following reasons, Defendants' motion is GRANTED and Plaintiff's motion is DENIED.

## II. BACKGROUND

**A. FACTUAL BACKGROUND**

This case involves a dispute over records requested by Plaintiff through the Freedom of Information Act ("FOIA Request"), 5 U.S.C. § 552(b), *et seq.* On July 27, 2010, Plaintiff submitted

the FOIA Request to Defendant FBI, seeking documents related to the FBI's "use of race and ethnicity to conduct assessments and investigations in local communities in Michigan." On November 4, 2010, the FBI informed Plaintiff that it was searching for documents responsive to Plaintiff's request.

According to the declaration of David M. Hardy, Section Chief of the Record/Information Dissemination Section of the FBI, the FBI then conducted a search of its Central Records System for documents potentially responsive to the FOIA Request. The FBI also performed an individualized search inquiry by issuing Electronic Communications ("ECs") to the Director's Office, the Directorate of Intelligence, the Office of the General Counsel, and to the Detroit field office ("Detroit"). The search identified 1,553 pages of records potentially responsive to Plaintiff's FOIA request.

On December 22, 2010, the FBI released 298 pages to Plaintiff ("First Release") and advised that some of the pages contained redactions of information withheld pursuant to exemptions contained in 5 U.S.C. § 552(b). On February 16, 2011, Plaintiff sent a letter to the FBI appealing the First Release ("Appeal"), alleging the FBI's "Failure to Timely Respond, Failure to Make Promptly Available the Records Sought, Improper Withholding of Documents, and Failure to Grant Plaintiffs' Request for a Waiver and for a Limitation of Processing Fees in Response to [the FOIA Request]".[1] On February 22, 2011, the Department of Justice's ("DOJ") Office of Information Policy acknowledged the Appeal and assigned it a tracking number. On May 23, 2001, the FBI wrote Plaintiff and advised that "[a]dditional material is currently being reviewed by an analyst."

Subsequently, the parties agreed that the FBI would produce additional responsive, nonexempt documents on September 29, 2011 and October 31, 2011. The FBI did so, releasing 12 and 46 pages, in full or in part, on those respective dates. Thus, of the 1,553 pages of potentially responsive records subject to the FOIA Request, 356 were released in full or in part, 1,007 were withheld in full pursuant

---

[1] The fee waiver and processing fees claims have since been resolved.

to 5 U.S.C. § 552(b), and 190 were withheld as duplicates.   Defendants assert that the portions withheld are exempt from disclosure under 5 U.S.C. § 552(b).

## B. PROCEDURAL BACKGROUND

On July 21, 2011, Plaintiff filed its complaint for injunctive relief in this Court, challenging Defendants' actions in response to the FOIA request.  In its complaint, Plaintiff alleges that Defendants: (1) Improperly withheld and/or delayed the processing of agency records in violation of the FOIA; (2) failed to release records responsive to the Request; (3) failed to timely respond to Plaintiff's request; (4) failed to make promptly available the records sought by Plaintiff's request; (5) improperly withheld information; (6) failed to make a reasonable effort to search for records responsive to the Request; (7) failed to grant Plaintiff's request for a public interest fee waiver; and (8) failed to grant Plaintiff's request for a limitation of fees.

On March 9, 2012, upon stipulation of the parties, the Court entered an Order setting forth a jointly agreed upon briefing schedule for the parties' cross motions for summary judgment.  The issues presented by the parties in their respective motions are:  (1) whether the FBI is a proper Defendant in this case; (2) whether Defendants' Search for FOIA Material was Adequate; (3) whether Defendants properly withheld material under FOIA Exemptions 1, 7(A), and 7(E); and (4) how the Court should address Defendants' Potential reliance on § 552(c) of FOIA, which allows an agency to "exclude," rather than "exempt," certain material from FOIA.

## III.  LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001).  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in

3

favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325).

Once the moving party has met its burden of production, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

### A. WHETHER THE FBI IS A PROPER DEFENDANT IN THIS CASE

Defendants seek to dismiss the FBI from this case, contending that the DOJ is the only proper Defendant because "[t]he FBI is a component of the DOJ and not an 'agency' as defined by the FOIA," and because dismissing the FBI as a Defendant would have "no legal effect" on this case. The Court disagrees. Based upon the Court's plain reading of the definition of "agency," and upon similar determinations made by other courts, the Court finds that the FBI is an "agency" for FOIA purposes.

The FOIA incorporates the definition of "agency" that appears in the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 552(f) (citing 5 U.S.C. § 551(1)). The APA definition of "agency" includes "*each* authority of the Government of the United States, *whether or not it is within or subject to review by another agency*." 5 U.S.C. §551(1) (emphasis added). First, it would be difficult to argue

that a "threat-focused national security and law enforcement organization [that is the] principal investigative arm of the U.S. Department of Justice and a full member of the U.S. Intelligence Community"[2] is not an "authority" of the U.S. Government.  Second, while the definition in §551(1) expressly excludes several government entities from the definition of "agency," including the Congress, U.S. Courts, and military commissions, 5 U.S.C. §551(1)(a)–(h), none of the exclusions apply to the FBI.  Thus, based solely on the text of the definition, the FBI is a proper Defendant because it is an authority of the U.S. government, irrespective of the fact that it is a component of the DOJ.  *See Cloonan v. Holder,* 768 F. Supp. 2d 154, 162 (D.D.C. 2011) ("naming components as defendants . . . is appropriate since the statute's plain language is clear").

Additionally, other courts have held that the FBI is a proper defendant for purposes of FOIA. *See Peralta v. U.S. Attorney's Office,* 136 F.3d at 173 (D.C. Cir. 1998) ("we have observed previously that FBI is 'clearly . . . covered' by the FOIA") (citing *McGehee v. CIA,* 697 F.2d 1095 (D.C. Cir. 1983)); *Lair v. Dep't of Treasury,* No. 03–cv–827, 2005 WL 645228, at *3, 2005 U.S. Dist. LEXIS 4645, at *8 (D.D.C. Mar. 21, 2005) ("naming components [as defendants] is proper").  The Court also notes that the FBI has litigated numerous FOIA cases in its own name before a number of courts including the Supreme Court and the Sixth Circuit "with the DOJ as one of its components appearing as counsel."  *Peralta,* 136 F.3d at 173–74.  As such, the Court finds that the FBI is a proper Defendant in this case.

**B. WHETHER DEFENDANTS' SEARCH FOR FOIA MATERIAL WAS ADEQUATE**

Plaintiff argues that Defendants' search for potentially responsive records was inadequate under the FOIA.  The Court finds, however, that it need not address the merits of Plaintiff's inadequate search claim because Plaintiff has failed to exhaust its administrative remedies with respect to this claim.

---

[2] *See What is the FBI?,* available at http://www.fbi.gov/about-us/faqs.

A plaintiff is required to exhaust administrative remedies before seeking judicial review of a FOIA request. *See* 5 U.S.C. § 552(a)(6)(A)(i)–(ii). A plaintiff's failure to exhaust administrative remedies precludes a federal court from exercising subject-matter jurisdiction over the party's FOIA claims. *See id.* The FOIA statute is clear that a requester has constructively exhausted administrative remedies when the agency fails to substantively determine an appeal within twenty days. 5 U.S.C. § 552(a)(6)(A)(ii) (appeal must be decided within twenty working days); *id.* § 552(a)(6)(C)(i) (FOIA requester "shall be deemed to have exhausted" administrative remedies when the agency fails to comply with 5 U.S.C. § 552(a)(6)(A)(ii)). A FOIA requester therefore "may seek judicial review" when an agency has not decided an appeal within the required twenty days. *Oglesby v. U.S. Dep't. of Army*, 920 F.2d 57, 64 n.8 (D.C. Cir. 1990).

After the FBI's First Release, Plaintiff timely filed an appeal, challenging Defendants' purported:

> Failure to Timely Respond, Failure to Make Promptly Available the Records Sought, Improper Withholding of Documents, and Failure to Grant Plaintiff's Request for a Waiver and for a Limitation of Processing Fees in Response to [the FOIA Request].

For each of these claims, Plaintiff provided a corresponding FOIA section that Defendants allegedly violated. At the time Plaintiff filed this case, Defendants had yet to decide the Appeal, which had been pending for almost five months. Plaintiff thus constructively exhausted all the claims raised in its Appeal. *See Oglesby*, 920 F.2d at 64. The Court notes, however, that nowhere in the Appeal does Plaintiff question or challenge the adequacy of Defendants' search.

In contrast, Plaintiff's Complaint includes an express challenge to the adequacy of Defendants' search, citing a violation of 5 U.S.C. § 552(a)(3)(C). Plaintiff's Appeal made no mention of § 552(a)(3)(C). If Plaintiff never notified Defendants of its objection to their search, then Plaintiff did not appeal this specific issue and thus could not have administratively exhausted this claim. Therefore, the Court lacks subject-matter jurisdiction over Plaintiff's search claim.

The Court turns next to the primary issue in this case—whether Defendants properly withheld material in connection with Plaintiff's FOIA Request.

## C. MATERIAL WITHHELD BY DEFENDANTS

The material withheld by Defendants ("Material") comprises five types of information maintained by the FBI: (1) the Domestic Investigation and Operations Guide ("DIOG") Training Materials; (2) Program Assessments; (3) Electronic Communications; (4) Domain Intelligence Notes; and (5) Maps. Defendants withheld this information, in full or in part, pursuant to FOIA Exemptions 1, 6, 7(A), 7(C), 7(D), and 7(E). The Court notes that Plaintiff does not oppose Defendant's motion with respect to Exemptions 6, 7(C) and 7(D). Rather, Plaintiff takes issue with: (1) Defendants' reliance on Exemptions 1 and 7(A) in withholding material from Program Assessments, Electronic Communications, Domain Intelligence Notes, and Maps; and (2) Defendants' reliance on Exemption 7(E) in withholding certain DIOG Training Materials.

When an agency makes a withholding pursuant to a FOIA exemption, the agency must explain the exemptions claimed and the applicability of the exemptions. *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 753 (1989). "Ordinarily, the agency may justify its claims of exemption through detailed affidavits, which are entitled to a presumption of good faith." *Rugiero*, 257 F.3d at 544. "Unless evidence contradicts the government's affidavits or establishes bad faith, the court's primary role is to review the adequacy of the affidavits and other evidence." *Id.*

Here, Defendants explained the exemptions they relied upon to withhold material via the declaration from David M. Hardy[3] ("Hardy Declaration") and an accompanying Vaughn Index[4]. *See, e.g.*, Dkt. 19, ex. 1, 2. Thus the Court's role shall be to review the Hardy Declaration and the evidence

---

[3] Hardy is the FBI's Section Chief of the Record/Information Dissemination Section, Records Management Division.
[4] A "Vaughn Index" is a routine device through which an agency describes the documents responsive to a FOIA request and indicates the reasons for redactions or withholdings in sufficient detail to allow a court to make an independent assessment of the claims for exemptions from disclosure under FOIA. *Rugiero*, 257 F.2d at 544 (citations omitted).

submitted to determine whether anything contradicts Defendants' affirmations or establishes bad faith. The Court will uphold the government's position if it "[1] fairly describes the content of the material withheld[,] . . . [2] adequately states its ground for nondisclosure, and . . . [3] those grounds are reasonable and consistent with the applicable law[.]" *Rugiero*, 257 F.3d at 544 (quotations omitted).

## D. DEFENDANTS' RELIANCE ON EXEMPTION 1

Defendants withheld a significant portion of material by relying on FOIA Exemption 1, which allows an agency to withhold "matters that are—(A) specifically authorized under criteria established by an Executive order to be *kept secret in the interest of national defense or foreign policy* and (B) are in fact properly classified pursuant to such an Executive order." 5 U.S.C. § 552(b)(1) (emphasis added). "In determining the applicability of Exemption 1, a reviewing court should accord substantial weight to the agency's affidavits regarding classified information." *Jones v. FBI*, 41 F.3d 238, 244 (6th Cir. 1994) (internal quotation marks omitted). This is because courts "lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case." *Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993).

In short, Exemption 1 exempts disclosure of material that has been deemed "classified" under criteria set forth in an Executive Order. In this case, the withheld information was classified under Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) (amended at 75 Fed. Reg. 1013) ("E.O. 13,526"). Information is deemed classified by E.O. 13,526 if:

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more of the categories of information listed in § 1.4 of this order;
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national

security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order No. 13,526 § 1.1(a). Section 1.4 of E.O. 13,526 states as follows:

Sec. 1.4. Classification Categories. Information shall not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security in accordance with section 1.2 of this order, and it pertains to one or more of the following:

(a) military plans, weapons systems, or operations;
(b) foreign government information;
(c) intelligence activities (including covert action), intelligence sources or methods, or cryptology;
(d) foreign relations or foreign activities of the United States, including confidential sources;
(e) scientific, technological, or economic matters relating to the national security;
(f) United States Government programs for safeguarding nuclear materials or facilities;
(g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or
(h) the development, production, or use of weapons of mass destruction.

Exec. Order No. 13,526 § 1.4.

As detailed below, the Court finds that the four categories to which Hardy applied Exemption 1—Domain Intelligence Notes, Program Assessments, Electronic Communications, and Maps—all contain information that (1) relates to intelligence activities, sources, and methods and/or (2) foreign relations or foreign activities of the United States.

### 1. Domain Intelligence Notes

According to Hardy, Domain Intelligence Notes ("DINs") are FBI analysts' method of collecting and recording information gathered on a particular group or element through various intelligence techniques.

Hardy determined that the disclosure of certain DINs could damage foreign relations. Specifically, he determined that the notes that contain "sensitive intelligence information gathered about, or from, a foreign country could injure diplomatic relations between the U.S. and those countries." Hardy Decl. ¶ 54. Hardy concluded that revealing such information could, among other

9

things, lead to diplomatic and economic retaliation against the United States. *Id.* ¶ 55.  The FBI withheld the documents cited in paragraph 54 of the Hardy declaration "so as not to jeopardize fragile relationships" with foreign governments. Hardy Decl. ¶ 54.

Hardy also includes detailed descriptions of the DINs in question.  For instance, he notes that document DE-GEOMAP-744-754 "identifies and analyzes the presence and threat posed to certain industries and areas in Michigan" by foreign entities.  Hardy Decl. ¶ 60.  Hardy reasoned that "[i]f the subjects which the analyst is studying were to know the sources of the analyst's intelligence information or the methodology and tools which the analyst uses to make his/her predictions and recommendations, those subjects would easily be able to change their behaviors and go undetected." *Id.* ¶ 51.  He states that, in turn, this would damage the FBI's ability to protect the United States' national security against hostile entities and to detect and apprehend criminals.  To protect the FBI's ability to gather intelligence, Hardy classified this DIN.

### 2. Program Assessments

Hardy states next that the FBI withheld portions of Program Assessments ("Assessments") under Exemption 1 to protect intelligence gathering abilities and operations and foreign relations.  An Assessment discusses the threats and vulnerabilities, key concerns, and priorities for the FBI's Detroit Field Office's area of operations.

Again, Hardy uses concrete illustrations of his reasons for withholding certain Assessments.  For instance, he identifies document DE GEOMAP 1346-1369 as an assessment of the threat posed by terrorism to the Detroit Field Office's area of responsibility, and notes that it discusses the threats, vulnerabilities, and knowledge gaps concerning terrorism related matters.  He found that this Assessment contains information that pertains to the FBI's intelligence activities and methods in that area and that disclosure of this information would cripple the FBI's efforts to stay ahead of perpetrators that threaten national security.

Hardy also found that the Assessments contain sensitive intelligence information about foreign relations, as they discuss foreign threats, including a foreign country's intelligence gathering efforts and the FBI's counterintelligence activities. From this, Hardy reasoned that disclosure could jeopardize foreign relations, and, by extension, national security.

### 3. Electronic Communications

The Electronic Communications ("ECs") at issue document the analyses and work product of the FBI agents and analysts involved in the intelligence activities that gather information on various threats. Hardy states that the ECs in question contain information that pertains to the FBI's intelligence activities and methodologies in the Detroit area of operations, and that their disclosure would cripple the FBI's efforts to stay ahead of perpetrators that threaten national security.

Again, Hardy provides detailed descriptions of the ECs in question. For example, he notes that document DE GEOMAP-483-485 was "created for the purpose of opening an assessment of international terrorism crimes/threats in the Detroit Field Office's area of responsibility, to determine the scope of the international terrorism threat posed by international terrorist groups conducting recruitment, radicalization, fund-raising, or violent terrorist acts within the state of Michigan." Hardy Decl. ¶ 60.

### 4. Maps

The maps at issue show a geographic area and include notations regarding information relevant to the FBI's investigations or intelligence gathering activities. For example, the map identified as DE-GEOMAP 738 shows the Detroit area and notations regarding certain businesses located there. Hardy states that Maps "provide a view of the intelligence data an analyst collects in a visual format [and] are another method of utilizing the highly sensitive intelligence tools available to [the analyst]." Hardy Decl. ¶ 50. Disclosure of the information in the maps would reveal the sources and focus of the FBI's

intelligence activities, and would frustrate its ability to "protect the United States' national security and detect and apprehend violators of criminal laws." *Id.* ¶ 51.

### 5.  Conclusion Regarding Defendants' use of Exemption 1

In his declaration, Hardy states that he is "an original classification authority," and that he personally reviewed the withheld information and determined that the information was under the control of the U.S. Government, was classified, and required the classification marking of "Secret." Hardy declares that he made certain that all of the procedural and administrative requirements of the Executive Order were followed, including proper identification and marking of documents.

As to the substance of the material, Hardy determined that the material is exempt from disclosure pursuant to § 1.4 of E.O. 13,526, since the material involves intelligence activities, sources, or methods and/or relates to foreign relations or foreign activities of the United States, including confidential sources.  From this, Hardy determined that disclosing this material could reasonably be expected to cause serious damage to national security.

Giving substantial weight to Hardy's statements, the Court finds that Hardy fairly describes the content of the material withheld, that he adequately states the FBI's ground for nondisclosure, and that those grounds are reasonable and consistent with the criteria set forth in E.O. 13,526. *See Rugiero*, 257 F.3d at 544 (quotations omitted). Additionally, there appears to be no evidence contradicting the Defendants' declaration or establishing bad faith. *Id.*  As such, the Court finds that Defendants have properly invoked Exemption 1.

### E. DEFENDANTS' RELIANCE ON EXEMPTION 7(A)

Plaintiff disputes Defendants' use of Exemption 7(A) to withhold information from DINs, Assessments, ECs and Maps.  Exemption (7)(A) exempts "records compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings[.]"  The Sixth Circuit has

adopted a *per se* rule that designates any documents compiled by a law enforcement agent [including an FBI agent] as being "compiled for law enforcement purposes." *Jones,* 41 F.3d at 245–46.

Exemption 7(A) is intended to make clear that investigative files that do not pertain to a pending or prospective enforcement proceeding are not exempted. *Robbins Tire,* at 230–232. Thus, "[l]aw enforcement records cannot 'reasonably be expected to interfere with enforcement proceedings' . . . unless there is at least 'a reasonable chance that an enforcement proceeding will occur[.]'" *Dickerson v. Department of Justice,* 992 F.2d 1426, 1430 (6th Cir.1993), (quoting *Nevas v. Dept. of Justice,* 789 F.Supp. 445, 448 (D.D.C.1992)).

Additionally, "interference" need not be established on a document-by-document basis; instead, courts may determine the exemption's applicability "generically," based on the categorical types of records involved. *Robbins Tire & Rubber Co*., 437 U.S. at 236; *see also Reporters Comm*., 489 U.S. at 776–80. Consequently, courts may accept affidavits that specify the distinct but generic categories of documents at issue and the harm that would result from their release, rather than requiring extensive, detailed itemizations of each document. *See Dickerson v. Dep't of Justice*, 992 F.2d 1426, 1431 (6th Cir. 1993) ("Where exemption (7)(A) is concerned, as a practical matter, it is often feasible for the courts to make generic determinations about interference with enforcement proceedings.") (internal quotation marks omitted from parenthetical).

According to Hardy, the FBI carefully reviewed all responsive information in this case to determine if the information was current intelligence information being used in pending or prospective investigations or prosecutions. The FBI's Record /Information Dissemination Section consulted with the Detroit Field Office and confirmed that the documents described in paragraph 60 are all being used by intelligence analysts and special agents for ongoing investigations.  Hardy reasons that disclosing these documents would, among other things, harm the FBI's ability to track specific current and pending threats and that "[t]hose entities that would seek to do harm would then become aware of the

13

multiple investigations and investigative activities and change their behavior and/or the 'players' to avoid detection and/or further investigation." Hardy Decl. ¶ 59.

As courts have recognized, "[t]he principal purpose of Exemption 7(A) is to prevent disclosures which might prematurely reveal the government's . . . focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence." *Maydak v. DOJ*, 218 F.3d 760, 762 (D.C. Cir. 2000). The Exemption also protects against witness intimidation and facilitates the corroboration of witness statements. *Dickerson*, 992 F.2d at 1433. The information withheld by Defendants pursuant to 7(A) is precisely that type of information. *See* Hardy Decl. ¶ 60.

Plaintiff argues that information withheld by the FBI that pertains to race and ethnicity is public information that cannot reasonably interfere with enforcement proceedings and must therefore be disclosed. As Defendants note, however, information relating to race and ethnicity may be significant to an investigation. "National security investigations often have ethnic aspects; members of a foreign terrorist organization may be primarily or exclusively from a particular country or area of the world. Similarly, ethnic heritage is frequently the common thread running through violent gangs or criminal organizations [such as MS-13]." FBI, 2011 DIOG, § 4.3.1. As such, releasing demographic information about specific ethnic groups in specific areas, compiled in the course of an investigation, could reasonably be expected to alert a criminal organization that it may be the subject of an investigation. This would then allow the group "to change their behavior and/or the 'players' to avoid detection and/or further investigation." Hardy Decl. ¶ 59. As such, Defendants' use of Exemption 7(A) is proper to protect the integrity of their investigations.

## F. DEFENDANTS' RELIANCE ON EXEMPTION 7(E)

Plaintiffs also dispute Defendants' use of Exemption 7(E) to withhold certain DIOG Training Materials. Exemption 7(E) allows the withholding of materials that would "[1] disclose techniques and

procedures for law enforcement investigations or prosecutions, or [2] would disclose guidelines for law enforcement investigations if such disclosure could reasonably be expected to risk circumvention of the law." This provision, however, only protects "techniques and procedures" not already well-known to the public. *See, e.g., Davin v. DOJ,* 60 F.3d 1043, 1064 (3d Cir. 1995) (quoting *Ferri v. Bell,* 645 F.2d 1213, 1224 (3d Cir. 1981)); *Rosenfeld v. DOJ,* 57 F.3d 803, 815 (9th Cir. 1995) (citations omitted). As to "guidelines for law enforcement investigations," this information may be withheld only if "disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). No such showing of harm is required for the withholding of law enforcement "techniques or procedures," however; these materials receive categorical protection from disclosure. *See Allard K. Lowenstein Intern. Human Rights Project*, 626 F.3d at 681–82; *ATF*, 977 F. Supp. 496, 501 (D.D.C. 1997) (citing *Fisher v. DOJ*, 772 F. Supp. 7, 12 n.9 (D.D.C. 1991), aff'd, 968 F.2d 92 (D.C. Cir. 1992)).

Hardy asserts that the information was properly withheld as comprising "techniques and procedures," and "guidelines for investigation." A brief summary of Hardy's reasoning and explanations are listed below.

### 1. Techniques and Procedures

#### a. Surveillance, Monitoring, and Mapping Information/Tools

Hardy states that the DIOG materials in question contain information on the types of devices, methods, and/or tools used in surveillance, monitoring, and mapping, as part of the FBI's investigations. He acknowledges that some of these techniques are unknown by the public, while others may be generally known. He states that the known techniques and tools should nonetheless be protected from release because the information includes *details* that are unknown, such as the techniques' limitations, their planned expansion in future operations, the specifics of their capabilities,

or the manner in which the FBI uses this information in its investigations. Hardy states that disclosing these techniques and tools would reduce their effectiveness.

Hardy additionally explains that disclosing these techniques would interfere with the FBI's efforts to gather intelligence necessary to prevent crime and terrorist activity, since disclosure would enable the criminals to educate themselves on the FBI's devices, methods, and tools, and thereby devise countermeasures to avoid detection. *See* Hardy Decl. ¶ 82.

> b. *Unaddressed Work*

Hardy states that certain DIOG Training Materials contain "descriptions of procedures with respect to the treatment and storage of . . . work that the FBI has not yet completed." Hardy Decl. ¶ 83. Hardy declares that this information is not public, and that its release "would reveal how the FBI deals with internal resource limitations and also identifies a place where information useful to potential lawbreakers is maintained." *Id.* He reasons that disclosing this information would provide a target for intelligence exploitation and undermining crime deterrence efforts.

> c. *Collection and/or Analysis of Information*

Hardy identifies certain other documents as containing discussions of the FBI's methods and techniques for collecting and analyzing information for investigatory purposes. He again acknowledges that the public is generally aware that the FBI collects certain types of information. He specifies, however, that the manner in which the FBI does so is not publicly known, and that the effectiveness of the methods discussed would be diminished were the methods publicized. He reasons that this, in turn, would hinder the FBI's ability to prevent harm to national security.

> d. *Identification and Contents of File Numbers, Identifying Symbols, Forms and Database Terms and Definitions*

Hardy concludes that other portions of the DIOG Materials contain information including filing numbers and procedures for the FBI's non-public databases. Hardy asserts that this information was

properly withheld because it is not public, and if it were released, it could be used by those seeking to subvert the activities of the FBI or "cover their tracks." Hardy Decl. ¶ 87.

### 2. Guidelines for Investigations

Hardy notes that the FBI has withheld under Exemption 7(E) additional information consisting of guidelines for law enforcement investigations, the disclosure of which could reasonably be expected to risk the circumvention of law.

#### a. Specific Scenarios in which Particular Activities or Techniques are Authorized

Hardy explains that some DIOG Materials contain hypotheticals about when particular investigatory techniques may be used or certain procedures must be followed. These training exercises are not known to the public because release of such information could increase the risk of individuals circumventing the law. If an individual considering engaging in illegal activity became aware of specific activities that would or would not trigger authority for particular investigative tactics, the individual could conform his behavior to non-detection. This in turn could hinder the effectiveness of such techniques, warranting non-disclosure under Exemption 7(E).

#### b. Undisclosed Participation

The DIOG Materials contain information on circumstances under which FBI personnel and confidential sources may or may not engage in undisclosed participation in the activities of third parties and the extent to which participation is permitted. Were this information to be made public, it would not only "undermine the effectiveness of the technique, but it could also place FBI agents or sources in physical jeopardy." Hardy Decl. ¶ 89.

#### c. Approval Limitations & Technical or Practical Limitations on Particular Investigative Techniques

The FBI has withheld material that discusses a technique or procedure and corresponding limitations on that technique or procedure. These limitations are not known to the public, but would be

of interest to those seeking to circumvent the law. If the techniques and procedures in question were known to the public, then criminals and terrorists could more easily circumvent them. *See* Hardy Decl. ¶ 91.

### 3. Conclusion as to Defendants' use of Exemption 7(E)

Having reviewed the Hardy Declaration and the accompanying Vaughn Index submitted by Defendants, the Court is satisfied that the FBI has identified and applied the legal standards governing exemptions from disclosure under the FOIA and has described responsive documents with sufficient particularity. Hardy describes certain FBI techniques and procedures that could lead to circumvention of the law. Information regarding "techniques or procedures" receives categorical protection from disclosure. *See Lowenstein*, 626 F.3d at 681–82; *Smith v. ATF*, 977 F. Supp. at 501.

Additionally, the fact that some of the withheld information may have been generally known to the public is not dispositive. *See Coleman v. FBI*, 13 F. Supp. 2d 75, 83 (D.D.C. 1998) (finding certain information covered by 7(E) despite the fact that "the techniques themselves have already been identified by the FBI," because "the documents in question involve the manner and circumstances of the various techniques that are not generally known to the public"). Hardy also identifies FBI guidelines and procedures, the knowledge of which could allow targets to avoid detection. Information regarding "guidelines for law enforcement investigations," may be withheld if "disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

Therefore, the Court finds that Hardy fairly describes the content of the material withheld, and adequately states the FBI's grounds for withholding the material and that those grounds are reasonable and consistent with the applicable law. The Court further finds no evidence that contradicts the Defendants' declaration or establishes bad faith. *Rugiero*, 257 F.3d at 544. As such, Defendants have properly invoked Exemption 7(E).

### H. DEFENDANTS' POTENTIAL RELIANCE ON SECTION 552(C)

18

Last, Plaintiff claims that Defendants may have relied on 5 U.S.C. § 552(c) to "exclude" certain material from the purview of FOIA. Plaintiff bases this claim on the identification of certain categories of intelligence documents that may qualify under 5 U.S.C. § 552(c)(3).

Section 552(c) provides that agencies may treat certain law enforcement and national security records "as not subject to the requirements" of FOIA. 5 U.S.C. § 552(c). Congress added section 552(c) to the FOIA in 1986 to allow an agency to "treat the records as not subject to the [FOIA] requirements" in three specific categories involving: (1) ongoing criminal investigations; (2) informant identities; and (3) classified foreign intelligence or international terrorism information. 5 U.S.C. § 552(c)(1)–(c)(3). *See also Benavides v. DEA.,* 968 F.2d 1243, 1246–47 (D.C. Cir. 1992) (discussing the legislative history of the "three exclusions of § 552(c)"). Section 552(c) differs from 552(b), as § 552(c) allows the government to "exclude" certain highly sensitive information from the scope of the FOIA, not simply "exempt" information from production. *Steinberg v. DOJ*, No. 93-2409, 1997 WL 349997, at *1 (D.D.C. June 18, 1997). "An 'exclusion'" is different from an exemption in that the Government need not even acknowledge the existence of excluded information. Rather, the Government is permitted to file an *in camera* declaration, which explains either that no exclusion was invoked or that the exclusion was invoked appropriately." *Id.*

Plaintiff, however, opposes *in camera* review and instead proposes a different procedure to adjudicate its claim under § 552(c). Plaintiff asks the Court to require Defendants to submit "public court filing[s]" indicating whether the Defendants interpret all or part of Plaintiff's FOIA request as seeking records that, if they exist, would be excludable under Section 552(c)(3). *Id.* at 33. Plaintiff then asks that the parties brief, and that the Court resolve, whether the *existence* of the records sought is itself exempt from disclosure. Under this proposal, the parties' "briefing and the Court's opinion would address a *hypothetical question—*whether any of the requested records, *if they exist*, fall under Section 552(c)[.]" The Court finds Plaintiff's proposed procedure unnecessary.

Here, Defendants filed an *in camera*, *ex parte* declaration addressing Plaintiff's § 552(c) claim, thereby allowing the Court to determine whether any exclusion was properly used. The Court has fully reviewed Defendants' *in camera* declaration and Plaintiff's § 552(c) exclusion claim. While neither confirming nor denying the existence of any exclusion, the Court "finds and concludes that if an exclusion was . . . employed[,] it was and remains amply justified."  *See Beauman v. FBI*, No. 92-7603 (C.D. Cal. Apr. 28, 1993). *See also Steinberg*, 1997 WL 349997 at *1.

## V. CONCLUSION

Accordingly, for the above stated reasons, IT IS HEREBY ORDERED that Defendants' motion for summary judgment [dkt 19] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment [dkt 25] is DENIED.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff

Date: September 30, 2012                    HON. LAWRENCE P. ZATKOFF
                                            U.S. DISTRICT COURT JUDGE